231 N.J. Super. 258 (1989)
555 A.2d 667
STATE OF NEW JERSEY, PLAINTIFF-APPELLANT,
v.
RORY SCOTT, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued November 2, 1988.
Decided February 24, 1989.
*260 Before Judges KING, BRODY and ASHBEY.
James S. Brewer, Assistant Prosecutor, argued the cause for appellant (John H. Stamler, Union County Prosecutor, attorney; James S. Brewer, of counsel and on the letter brief).
William J. McCarthy argued the cause for respondent.
The opinion of the court was delivered by BRODY, J.A.D.
We granted the State's motion for leave to appeal an order suppressing evidence. Defendant is charged with possession of less than 25 grams of marijuana, a disorderly persons offense. N.J.S.A. 24:21-20a(4). The marijuana was in plain view on a bureau in his bedroom. The issue is whether shortly before he saw the marijuana, police officer Michael Mathis, the only witness at the suppression hearing, had lawfully arrested defendant pursuant to the Prevention of Domestic Violence Act (the act), N.J.S.A. 2C:25-1 et seq., and therefore had the right to accompany defendant to his bedroom.
Officer Mathis was on patrol in his radio car on Saturday, June 6, 1987, when at about 2 p.m. he was dispatched to defendant's home in response to a domestic dispute complaint made by defendant's sister, Dolores. The dispatcher advised Officer Mathis that Dolores had called the police to say that she had a domestic violence restraining order against defendant and "she felt that her life was being threatened by Rory being inside the house."
Acting on Dolores's complaint, a Superior Court judge on May 28 had issued ex parte a temporary restraining order barring defendant from their home[1] and prohibiting him from *261 "having any contact with the plaintiff or harassing plaintiff or plaintiff's relatives in any way...."[2]
The order required defendant and his sister to appear for a hearing on June 2. The sheriff officer's return of service at the foot of a copy of the filed order shows that only Dolores was served. The dispatcher did not tell Officer Mathis, presumably because she did not know, that the court had vacated the temporary restraining order on June 2 because neither party appeared.
When the officer arrived at defendant's home,[3] he waited for another officer who also had been dispatched there. Departmental procedures call for dispatching at least two officers to the scene of a domestic dispute because of the potential for sudden violence. Officer Mathis described those procedures in his direct examination:
Q What is the procedure when you are called to a domestic dispute?
A Separate both parties, calm things down, find out the stories, make sure they're aren't any cuts, people aren't beat up and basically find out what's going on. And if there's any restraining order on either party, go from there.
Q What is your responsibility with respect to the individuals involved as far as safety?

*262 A To protect them from being harmed by each other, separate them and also protect ourselves. We have to keep our eyes on them because they can turn on you at any time.
When the other officer arrived, Officer Mathis left his patrol car and they both walked up the driveway. As they neared the house, the officers "heard two individuals arguing, male and female, two voices as we approached the front door." Officer Mathis testified that the voices were "loud," "shouting."
Q Describe it besides shouting, if you can?
A I kept hearing Dolores saying, "I want you out of the house. I want you out of the house."
I can't recall what Rory was saying. He's hard to understand at times.
After Officer Mathis knocked on the door, Dolores invited him in and "advised me as we entered that there was a restraining order on Rory and she said she wanted him out of the house at that time."
Defendant was standing quietly in the living room in his pajamas. His sister sat down on a couch.
Q When you entered the house and you saw that Dolores had sat back down to the couch and Rory was calm, were you satisfied that any danger that might have been was suppressed?
A No.
Q Why?
A Dolores actually didn't  she sat on the couch but she still kept shouting she wanted Rory out of the house.
Q She didn't say anything else?
A No.
* * * * * * * *
Q What action did you take after that?
A I advised Rory that he would have to come back to headquarters with me.
He asked me if he could get his clothes because he was partially dressed, all he was wearing was pajama bottoms, no shirt, no shoes.
* * * * * * * *
Q After Dolores Scott requested that her brother be taken out of the house did Rory say anything?
A No, he was very cooperative, willing to leave.
Q He offered no resistance?
A None at all.
* * * * * * * *

*263 Q Did you ask Rory any questions at that time?
A No, I just told Rory he had to come back to headquarters with me. He requested to get some clothes, comb his hair.
Officer Mathis followed defendant into his bedroom because department procedure is to follow  whenever domestic, to follow the individuals around the house for our own protection in case they pick up a gun or knife.
When he entered the bedroom, Officer Mathis saw the marijuana on defendant's bureau.
The officer neither saw nor heard evidence that defendant had been violent. Although not in his report of the incident, he testified that Dolores told him that she feared for the life of her year-old baby if defendant was not removed from the house because he was "kind of crazy."
THE COURT: Did she give any indication, "crazy," in what way that would make him dangerous?
THE WITNESS: No, she didn't.
The officer testified that before he became a police officer, he had been a dispatcher and that as a dispatcher he "did send the cars to the house."
THE COURT: Do you have any violence that you heard?
THE WITNESS: I believe not violence but about eight months prior to this incident, he was  he pulled his pants down to his next door neighbor, a female. The lady lived next door to him. And grabbed his genitals and waved to the next door lady that lives next door.
THE COURT: And was there ever any threat of harm to anybody in a physical sense other than their sensitivities?
THE WITNESS: No, not that I can recall.
THE COURT: What made you think he was threatening? Was there something about it or was it simply  you understand. We're trying to find out simply because there was a restraining order that you felt required his removal or was there, in fact, besides that some actual threat that you felt that he posed through something you saw or something that you had any basis for believing.
* * * * * * * *
THE WITNESS: Dolores didn't actually state anything that he physically abused her or threatened her but by the way she was acting and the way she wanted him removed from the house, she felt her life was threatened. She wouldn't actually come out and say why she felt her life was threatened but just kept saying she felt she was in danger because of her baby. Her baby is only one year old.
*264 When Officer Mathis returned to headquarters with defendant he learned that the order on which he relied in making the arrest had been vacated.
Q Was there a valid restraining order?
A There was a restraining order signed by Dolores on Rory at the time.
I was informed by headquarters they had reason to believe the restraining order was still in effect.
When we got back to headquarters we looked at it and found out the days had expired for the number of days to go down to court and have it signed by the judge. And they never went to the court to have it signed by the judge, so it actually wasn't.
No one asked the officer what he had looked at that made him realize that the order had been vacated. It is not clear from the record whether the dispatcher had a basis, other than Dolores's assertion, for her statement to Officer Mathis that the temporary restraining order was in effect.
In State v. Bruzzese, 94 N.J. 210 (1983), police executed a valid arrest warrant at the defendant's home. The arresting officers permitted the defendant to go to his bedroom to dress before taking him to police headquarters. When they accompanied him there they saw and seized incriminating evidence that was in plain view. The Court held that the police acted reasonably in accompanying the defendant to his bedroom.
Accordingly, we rule that once a defendant is placed under lawful arrest, the arresting officer has the right to remain at his side and to follow him wherever he chooses to go. The officer need not posit any special need for the accompaniment so long as the arrest is lawful. The accompaniment is purely a precautionary measure. [Id. at 232. Emphasis supplied.]
The issue presented in the present case is whether defendant's warrantless arrest was lawful.
The trial judge analogized defendant's arrest to an arrest based on an arresting officer's erroneous but good faith belief that there is an existing arrest warrant. In such a case the arrest is not lawful even if the officer's belief was engendered by the statements of other police officers. Whiteley v. Warden of Wyoming Penitentiary, 401 U.S. 560, 568, 91 S.Ct. 1031, 1037, 28 L.Ed.2d 306, 313 (1971); State v. Cullars, 224 N.J. Super. 32, 37-38 (App.Div. 1988).
*265 In evaluating the lawfulness of an arrest, the analogy between an arrest warrant and a temporary restraining order issued pursuant to the act is not as apt as it may first appear. To be lawful an arrest must be based upon probable cause to believe that the person arrested had committed or was committing an offense. Where an arrest is based upon a warrant, the evidence of probable cause was perceived by the judge who issued the warrant; if there is no warrant, the arrest is unlawful because there is no probable cause.
Where exigent circumstances authorize a warrantless arrest, the arrest is based upon the evidence of probable cause that is perceived by the arresting officer. If the officer does not perceive evidence giving him probable cause to believe that the person arrested had committed or was committing a crime, the arrest is unlawful. State v. Cook, 47 N.J. 402, 414 (1966). A warrantless arrest for a disorderly persons offense is lawful only if the offense was committed in the arresting officer's presence. Bauer v. Borough of Cliffside Park, 225 N.J. Super. 38, 46 (App.Div. 1988); State in Interest of J.B., Jr., 131 N.J. Super. 6, 13 (J. & D.R.Ct. 1974).
The question here is not whether at the time of the arrest there was an existing temporary restraining order evidencing probable cause that defendant had once committed an act of domestic violence. Rather, the question is whether the arresting officer had probable cause to believe that defendant had knowingly violated a court order that barred him from the home.
At the time of this incident, violation of a temporary restraining order issued pursuant to the act was prosecuted as fourth-degree contempt, N.J.S.A. 2C:29-9:
A person is guilty of a crime of the fourth degree if he purposely or knowingly disobeys a judicial order or hinders, obstructs or impedes the effectuation of a judicial order or the exercise of jurisdiction over any person, *266 thing or controversy by a court, administrative body or investigative entity.[4]
The essential elements of the crime are that a person with a purposeful or knowing culpability, disobeys or hinders the effectuation of a court order.
Reflecting those elements, the act permits a police officer to make a warrantless arrest if the officer has probable cause to believe that the person arrested had been served with and violated an order issued pursuant to the act. N.J.S.A. 2C:25-5 provides:
a. A law enforcement officer shall arrest a person if a victim exhibits sign of injury caused by an act of domestic violence.
b. A law enforcement officer may arrest a person:
(1) When the officer has probable cause to believe that a person has violated the terms of an order issued pursuant to section 10, 11, 13 or 14 of this act and that service has been effected either in person or by substituted service. The officer may verify, if necessary, the existence of an order with the appropriate law enforcement agency; or
(2) When there is other probable cause to believe that an act of domestic violence has been committed. [The Legislature added paragraph a. by enacting L. 1987, c. 356, § 1, effective April 4, 1988.]
The State relies on the discretionary arrest provisions of what are presently designated subparagraphs b(1) and b(2).
For the arrest here to be lawful under subparagraph b(1), Officer Mathis must have had probable cause to believe that (1) defendant had violated the temporary restraining order and (2) the order had been served upon him.
Dolores's statement gave the officer probable cause to believe that an existing temporary restraining order had been issued under the act. However, the officer did not know what relief the order provided and therefore did not have probable cause to believe that defendant violated it merely by his presence in the home. Dolores's demand that defendant be removed *267 from the home did not give the officer a reasonable basis for knowing whether defendant's presence in the home violated the order, whether defendant had done something else that violated the order or whether defendant had done nothing that violated the order. The officer failed to ask Dolores or anyone at headquarters what the order provided.
Although the act does not require an arresting officer to verify the existence of a temporary restraining order, he must have some reasonable basis for knowing what conduct the order proscribes or prescribes in order to have probable cause to believe that a person violated it. The arrest was unlawful because the State failed to prove that Officer Mathis had probable cause to believe that defendant violated the provisions of an order issued pursuant to the act.
Even if our dissenting colleague is correct in concluding that the officer had probable cause to believe that the court had restrained defendant from being in the home, the State did not sustain its burden to prove that the officer had probable cause to believe that defendant had been served with the order, a separate and distinct predicate to a lawful arrest under subparagraph b(1). Without probable cause to believe that defendant had been served with the order, the officer had no basis for believing that defendant violated the order purposefully or knowingly, the culpability necessary to commit a contempt.
Defendant's silence cannot be interpreted as an acknowledgment that he had been served with the order. In addition to defendant's general right to remain silent in the presence of an arresting police officer, there was no occasion for him to deny that he had been served. We cannot tell from Officer Mathis's testimony whether defendant heard Dolores tell the officer as she let him in that she had obtained the court order and there is no evidence that the officer advised defendant before the arrest that there was a court order. Officer Mathis testified that the only thing he said to defendant was that he had to come to police headquarters.
*268 The dissent appears to proceed from the mistaken assumption that the officer was responding to a domestic violence complaint. Dolores's complaint was not that defendant had committed an act of domestic violence but that he had violated a court order. The trial judge expressly found that there had been no act of domestic violence and that the officer did not have probable cause to believe otherwise. We have quoted generously from Officer Mathis's testimony to demonstrate that he perceived little if any evidence to give him probable cause to believe that defendant had committed an act of violence so as to render the arrest lawful under subparagraph b(2). We sustain the trial judge's conclusion that the officer did not have probable cause to believe that defendant had been violent, because his findings that the officer neither saw nor heard evidence of an act of domestic violence "could reasonably have been reached on sufficient credible evidence present in the record." State v. Johnson, 42 N.J. 146, 162 (1964).
We share our dissenting colleague's concern that we not discourage police from arresting a person where there is probable cause to believe that he has knowingly violated a restraining order issued pursuant to the act or has committed an act of domestic violence that prompted the complaint to which the police are responding. At the same time we must not lose sight of legislative limitations on the authority of police officers to arrest a person accused of violating a domestic violence restraining order where the officer does not have probable cause to believe that the order prohibited what would otherwise be lawful conduct, where the officer does not have probable cause to believe that the order had been served on the person accused, or where the officer does not have probable cause to believe that the complaint to which he is responding had been prompted by an act of domestic violence.
Affirmed.
*269 ASHBEY, J.A.D., concurring and dissenting.
At 2:00 on the afternoon of June 6, 1987, police officer Mathis was dispatched to render police assistance to Rory Scott's sister for Rory's violation of a domestic violence restraining order and because "she felt that her life was being threatened" by Rory's presence. Mathis had been the police dispatcher for two years. He knew that the police had responded to the premises "numerous times," not only on "domestic problems with Rory and his sister," but also "Rory and his father." Rory Scott was "just very well known" for trouble at that family.[1] When Mathis got there, he waited for assistance from another officer.
Mathis heard Rory shouting through the door "maybe louder" than Dolores, although "[h]e's hard to understand at times." Upon entry Mathis found Rory standing and his sister sitting. Although it was afternoon, Rory was clad only in pajama bottoms. Mathis was aware that Rory had previously exposed himself to a neighbor. Dolores reiterated that there was a restraining order, that Rory was "kind of not sane," that her baby was not safe. Mathis credited Dolores' statement that she felt she was in danger. Although Rory was passive at the time, Mathis was not satisfied that any danger might have been suppressed. Rory agreed to accompany Mathis to the station, but he had to dress. Mathis kept Rory within his view as Rory went to the end of the small living room beyond a tied-back sheet.[2] Although Mathis's eye was on Rory, he saw the marijuana which was the subject of the suppression motion.
From the evidence the motion judge found as a fact:

*270 The officer said he felt he was dangerous, so overall view of the man, even though there are no actual  I'm not sure anything specific on which the officer felt  he knew they weren't getting along. He knew this person was some what erratic in his behavior in the past and displaying himself to the neighbor and multiple calls to the police department, he certainly felt that there was a claim that he was endangering the life of not only the sister but the child.

The question is: Is that a reasonable suspicion that would give him the right to accompany the defendant to keep him under view.
There's paucity, I admit, of any real indication from the officer that he was  that he, the officer, felt there was any danger that he could see with his own eyes of threatening conduct. He felt your client was  I think he felt there was a cause for the sister's concern. [emphasis added].
The applicability of the plain view doctrine depends upon the right of the officer "`to be in the position to have that view.'" State v. Ercolano, 79 N.J. 25, 35 (1979), quoting Harris v. United States, 390 U.S. 234, 236, 88 S.Ct. 992, 993, 19 L.Ed.2d 1067, 1069 (1968). The issue as framed by this court and the trial judge is one respecting a plain view search incidental to arrest.
In Washington v. Chrisman, 455 U.S. 1, 102 S.Ct. 812, 70 L.Ed.2d 778 (1982), the United States Supreme Court said:
... it is not "unreasonable" under the Fourth Amendment for a police officer, as a matter of routine, to monitor the movements of an arrested person, as his judgment dictates, following the arrest. The officer's need to ensure his own safety  as well as the integrity of the arrest  is compelling. Such surveillance is not an impermissible invasion of the privacy or personal liberty of an individual who has been arrested. [455 U.S. at 7, 102 S.Ct. at 817, 70 L.Ed.2d at 785 (footnote omitted)].
At issue is the following language of the Domestic Violence Act (Act):
A law enforcement officer may arrest a person:
(1) When the officer has probable cause to believe that a person has violated the terms of an order issued pursuant to section 10, 11, 13 or 14 of this act and that service has been effected either in person or by substituted service. The officer may verify, if necessary, the existence of an order with the appropriate law enforcement agency; or
(2) When there is other probable cause to believe that an act of domestic violence has been committed. [N.J.S.A. 2C:25-5b].
To interpret that statute's meaning in this context we must look to its beginning. In January 1981, the New Jersey Advisory Committee to the United States Commission on Civil Rights *271 issued a report called "Battered Women in New Jersey" (Report). In the Report the Commission said that in most New Jersey cities, the police dispatcher screened calls for assistance, two officers responded, but neither had the power to arrest for an offense. New Jersey Advisory Committee, U.S. Comm'n on Civil Rights, Battered Women in New Jersey 11 (1981). The Committee reported a widespread guideline to the police not to arrest. Report, supra, at 10. The Report further detailed many examples and criticisms in which police representatives were quoted as saying that their hands were tied by the law as it was then written. Report, supra, at 13.
In 1981, when the Legislature responded by enacting New Jersey's first domestic violence law (L. 1981, c. 426), it allocated the blame for the inadequacy of the prior law to the "system's inability to generate a prompt response in an emergency situation." N.J.S.A. 2C:25-2 (legislative findings and declarations). Following the passage of chapter 426, other reports emphasized the need of emergency response by the police. See Working Group on the Enforcement of the Prevention of Domestic Violence Act, Report (June 1, 1984) (Working Group Report).[3] Without exception, it was the position of concerned groups that the police historically had not responded appropriately to family violence emergencies. See also Finesmith, "Police Response to Battered Women: Critique and Proposals for Reform," 14 Seton Hall L.Rev. 74 (1983).
The statute has been amended several times since 1981. An early draft of L. 1987, c. 356, changed the officer's duty under N.J.S.A. 2C:25-5b(1) from "may verify" the existence of a restraining order to "shall verify" its existence. This change was eliminated in the final draft of that amendment. Thus, the legislature recently retained the present statutory language.
*272 I recite this history for two reasons: first, to support this court's apparent ruling that Mathis need not check upon the dispatcher's radio assertion, "that there is a temporary restraining order on Scott, the brother of the complainant," to have probable cause to believe the order was in effect. In responding to a radio call for help, Mathis was entitled to rely upon the information he was given as sufficient to meet the necessary statutory elements of probable cause to arrest. Respecting the content of the restraining order which Mathis was told existed, Mathis also had a right to believe that the order restrained defendant from the house.[4]
The legislative history is also relevant to the court's reason for affirmance. The trial court ruled that if there was no restraining order, there was no valid arrest, and if no arrest, there was no plain view of the contraband.[5] While this court does not rely upon the trial court's finding concerning Mathis's probable cause to arrest, it would nonetheless affirm, based primarily upon a lack of evidence that Mathis had probable cause to believe the restraining order had been served. I dissent from this view.
The issue was never raised before the Law Division. Moreover, while no one asked Mathis if he had advised Rory of the existence of the order, it is a reasonable inference from the evidence that the existence of the order was referred to in *273 Rory's presence by his sister as well as by Mathis and that Rory never denied its existence.[6] There is no evidence that Mathis had cause to believe the order was not served. While the court does not suggest exactly what Mathis should have done to verify service, other than to advise Rory, I believe Mathis had probable cause to believe the order was served (as he had probable cause to believe that it had been issued) from what the dispatcher told him, as well as from Rory's silence.
Although much emphasis has been placed upon Mathis's acting to enforce a restraining order, in my view, Mathis was also responding to a present domestic violence complaint. Thus there was an issue concerning whether Mathis had a right to arrest under N.J.S.A. 2C:25-5b(2). The court's affirmance on this issue rests on the trial court's finding that Mathis did not have probable cause to believe that Rory had engaged in any act of domestic violence.[7]
I agree with the court that the trial judge found that Mathis did not see evidence of violence, and that this finding was credibly supported in the record. For purposes of the suppression motion, however, I do not consider that finding material. Mathis was a policeman called to a domestic violence scene. If from all of the circumstances Mathis had cause to believe that Rory had previously engaged in a course of alarming conduct and now presented an immediate danger to Dolores and the *274 child, Mathis had the right to observe Rory in the minimally intrusive way that he did. I disagree with the trial judge and the court in their apparent view that Mathis had to see or hear evidence of domestic violence to observe Rory without violating his Fourth Amendment rights.
I would, moreover, not rest Mathis's right to observe on his right to arrest under either N.J.S.A. 2C:25-5b(1) or N.J.S.A. 2C:25-5b(2). Whether he was investigating a domestic violence complaint or waiting to enforce an order, Mathis was following reasonable procedures directed toward protecting police officers as well as domestic violence victims.[8] Acknowledging a self-protective exception from the warrant requirement for keeping a domestic violence defendant in the sight of the officer has the same rationale as permitting the officer to "stop and frisk" a suspect for weapons, that the officer need not risk the officer's life to protect Fourth Amendment rights. See State v. Thomas, 110 N.J. 673, 683 (1988).
In addition to a search incidental to arrest, and the right of the officer to "pursue his investigation without fear of violence," ibid., the "emergency aid" doctrine is an exception to the warrant requirement.
Perhaps the most commonly cited statement of the doctrine is found in United States v. Barone, 330 F.2d 543, 545 (2nd Cir.1964), cert. den. 377 U.S. 1004, 84 S.Ct. 1940, 12 L.Ed.2d 1053 (1964), where the court said: "The right of the police to enter and investigate in an emergency without the accompanying intent to either search or arrest is inherent in the very nature of their duties as police officers, and derives from the common law.' [Gallmeyer v. State, 640 P.2d 837, 841 (Alaska Ct. App. 1982) (footnote omitted)].
See generally 2 W. LaFave, Search & Seizure § 6.6(a) (1978); Mascolo, "The Emergency Doctrine Exception to the Warrant *275 Requirement Under the Fourth Amendment," 22 Buff.L.Rev. 419 (1973), cited in Gallmeyer v. State, 640 P.2d at 841 n. 5. In order to justify a warrantless search based on the police rendering "emergency aid," there must be (1) the existence of an emergency as viewed objectively (2) a search not motivated by a desire to find evidence and (3) a nexus between the search and the emergency. People v. Mitchell, 39 N.Y.2d 173, 177, 347 N.E.2d 607, 609, 383 N.Y.S.2d 246, 248 (Ct.App. 1976), cert. den. 426 U.S. 953, 96 S.Ct. 3178, 49 L.Ed.2d 1191 (1976).
In Gallmeyer v. State evidence was found admissible where police entered the home without defendant's consent (but without active opposition) in response to a domestic violence call. Although defendant was inside and the wife and child were outside the house, both the child and a police officer attempting to rescue the child were in danger if defendant had a gun as his wife said. 640 P.2d at 840, 845. See also People v. Koniecki, 135 Ill. App.3d 394, 399-401, 90 Ill.Dec. 173, 178-79, 481 N.E.2d 973, 978-980 (App.Ct. 1985) (evidence found by police would have been admissible when one of the house occupants made police reasonably believe the other occupant could be injured and police saw suspected contraband while searching the premises for the injured person; because police reentered the house to identify the contraband, they went beyond the proper reason for unwarranted police entry, and the evidence was not admissible); People v. Schrantz, 50 Mich. App. 227, 232-233, 213 N.W.2d 257, 260 (Ct.App. 1973) (evidence admissible where police forceably entered the house following a neighbor's report of screams; police knew of defendant's prior mental commitment and his previous history of violence which they used to obtain a current commitment order); State v. Boilard, 488 A.2d 1380, 1387 (Me.Sup.Ct. 1985) (evidence suppressed where police forceably entered home based only on being advised defendant sounded like he "was beating his kids"); Com. v. Rexach, 20 Mass. App. Ct. 919, 478 N.E.2d 744 *276 (App.Ct. 1985), review den. 395 Mass. 1103, 482 N.E.2d 328 (Sup.Ct. 1985) (evidence observed by police responding to domestic violence call admissible where precaution of keeping defendant in view was reasonable, based upon statute which required police to use all reasonable means to prevent further abuse and there was evidence that abuse had taken place).
In addition to the "emergency aid" doctrine to justify a "search," there is authority for the conclusion that there is no search at all when the police respond to community calls for help if a statute requires them to do so. In State v. Bridewell, 306 Or. 231, 238, 759 P.2d 1054, 1059 (Sup.Ct. 1988), the Oregon Supreme Court rejected a "plain view" argument in support of the admission of contraband as evidence following a police officer's intrusion into a dwelling to investigate the owner's disappearance. The court referred to the community "caretaking" police function, citing Cady v. Dombrowski, 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973), saying,
[t]here is no generic "community caretaking function." Whether law enforcement officers have specific functions is a matter of statutory law. [emphasis added].
In a dissenting opinion, joined by two other members of the court, Chief Justice Peterson presented a comprehensive history of the "caretaking" function of the police and its relation to the Fourth Amendment (going back to 1335). The Chief Justice concluded that contraband viewed by police while investigating an emergency should not be viewed as the result of a search. Justice Peterson said,
I maintain that the initial entry upon the defendant's property was not a search. The entry on the premises was to investigate the report of a concerned person, fearful that her friend was hurt or injured. Entering property to find whether the concerns were well founded was not a "search" as that term was understood in the state and federal constitutions in 1791 and 1859 and is not a search within the present day meaning of that term.
* * * * * * * *

*277 If the majority rule prevails, the assistance role of law enforcement personnel in this society will go downhill from here. [306 Or. at 253-254, 759 P.2d at 1067-1068].
N.J.S.A. 2C:25-5 codifies an "emergency aid" and a "community caretaking" police function. While Mathis's reasonable belief is not determinative, there is no doubt that Mathis considered himself a "caretaker."[9] Mathis testified that he did not consider his action in enforcing the restraining order (as he understood it), or in asking Rory to go to the station, as an "arrest." Mathis's stated purpose was merely to "escort" Rory to headquarters to enforce the order. To Mathis, Rory was only "arrested" after he saw the marijuana. While that is too narrow a meaning of "arrest," Mathis's view of his function was objectively reasonable. He was responding to an emergency call for police aid. His observation of contraband was inadvertent and directly connected to his police duty.[10]People v. Mitchell, 39 N.Y.2d at 177, 347 N.E.2d at 609, 383 N.Y.S.2d at 248. He also was taking reasonable self-protective measures. State v. Thomas, 110 N.J. at 683.
I would resolve the appeal from the order granting the suppression motion, therefore, by applying legal principles independent of Mathis's right to arrest to the facts as found by the trial judge. Applying those principles, including the doctrines of "emergency aid," "community caretaking" and Terry v. Ohio, 392 U.S. 1, 21-22, 88 S.Ct. 1868, 1879-1880, 20 L.Ed.2d 889 (1968), I would find that Mathis's actions accorded objectively with approved police procedure and the Act; his inadvertent observation of marijuana in the process was not an impermissible search and the evidence should not have been suppressed. Accordingly, I respectfully dissent.
NOTES
[1] N.J.S.A. 2C:25-14d provides:

Emergency relief may include forbidding the defendant from returning to the scene of the domestic violence together with any other appropriate relief.
[2] The act gives the court authority to issue temporary restraining orders that may provide a wide range of unspecified "emergency relief." N.J.S.A. 2C:25-14b provides:

If it appears that the plaintiff is in danger of domestic violence, the judge shall, upon consideration of the plaintiff's domestic violence complaint, order emergency relief including ex parte relief, in the nature of a temporary restraining order. A decision shall be made by the judge regarding the emergency relief forthwith. An order granting emergency relief, together with all pleadings, process and other orders, shall immediately be forwarded to the sheriff for immediate service of the order for emergency relief upon the defendant.
[3] The officer testified that the home is owned by defendant's father.
[4] N.J.S.A. 2C:29-9 has been amended to add a specific reference to violations of orders issued pursuant to the act. Such violations are now disorderly persons offenses unless the conduct which constitutes the violation is itself a crime or disorderly persons offense, in which case the violation is a fourth-degree crime. L. 1988, c. 28, § 3.
[1] Mathis said he was involved in or heard incidents between Dolores and Rory Scott. It is a fair inference from his testimony that he knew of specific incidents between Rory and his father but had not been involved.
[2] The house was very small. The front door entered into the living room. Rory's bedroom joined the living room, without a door. Between the living areas was a tied-back sheet. Mathis could see into Rory's sleeping area from the living room.
[3] We recognize that the context was battered wives. Our statute, however, broadens the category of domestic violence protected victims to include Rory's sister living in the same house. N.J.S.A. 2C:25-3a.
[4] "In-house" restraining orders were not to be issued unless plaintiff ... requests." See Memorandum from Chief Justice Wilentz to assignment judges (Feb. 11, 1986), reprinted at Supreme Court Family Division Practice Committee, Annual Report, at 125 (1986-1987).
[5] The motion judge referred to the "age of computers" suggesting that Mathis should have known that the order was not in effect. The ex parte domestic violence restraining order was dated May 28; the final hearing was June 2. Mathis was responding to a June 6 radio call for assistance. The statute orders that a Superior Court hearing be held within 10 days of an ex parte order. N.J.S.A. 2C:25-13c. It is unreasonable to expect the police department's files to be completely current with Superior Court records.
[6] In his police report the officer wrote that he had advised defendant of the existence of the order.
[7] What constituted an act of domestic violence, however, was not explored. Harassment is an act of domestic violence. N.J.S.A. 2C:25-3b(10). Harassment includes:

Engag[ing] in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy.... [N.J.S.A. 2C:33-4c].
[8] It is undisputed that domestic violence defendants represent one of the most dangerous of police encounters. See Working Group Report, supra, at 54, "... it has long been recognized that more police officers sustain injuries in response to domestic dispute calls than to any other type of response."
[9] Mathis's right to enter the premises, of course, was never in doubt. The question was his right to keep defendant in sight once he was in the house.
[10] Mathis testified that he did not even see the contraband at first because he was watching Rory.