843 A.2d 1132

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
THOMAS A. CASSIDY, DEFENDANT–APPELLANT.

Argued November 3, 2003—Decided March 30, 2004.

152

*Edward J. Zohn* argued the cause for appellant.

*Kristen M. Harberg,* Deputy Attorney General, argued the cause for respondent (*Peter C. Harvey,* Attorney General of New Jersey, attorney).

Justice LaVECCHIA delivered the opinion of the Court.

This criminal appeal has as its backdrop the Prevention of Domestic Violence Act, *N.J.S.A.* 2C:25–17 to –33 (the Act), which authorizes the issuance of *ex parte* restraining orders with an accompanying warrant to search for weapons. Defendant Thomas Cassidy appeals the failure to suppress evidence seized from his home pursuant to a defective *ex parte* domestic violence temporary restraining order (TRO). The State concedes the invalidity of the *ex parte* TRO that issued, and thus, the question is whether weapons seized as a result of the search may be used in defendant's subsequent criminal prosecution for possession of illegal firearms.

## I.

Briefly, the facts are as follows. Defendant was involved in a romantic relationship with Natalie DeGennaro from approximately February 1995 to February 1996. The two met while both worked at Newton Memorial Hospital—he as a security guard and she as an x-ray technician. Their relationship was volatile. According to DeGennaro, on multiple occasions defendant was verbally and physically abusive. When, in November 1995, she tried to break

off the relationship, defendant threw her into a door at the hospital. Two further attempts to end the relationship were frustrated by defendant's insistence that DeGennaro "couldn't leave him."

DeGennaro finally ended the relationship after yet another physical assault. On February 15, 1996, defendant and a friend came to the hospital to see her while she was on duty. To DeGennaro, both appeared intoxicated. Defendant refused to leave when DeGennaro asked that he do so. Instead, he responded by placing his hand over her mouth and nose, and pushing her against a wall. When she tried to loosen his grip on her, defendant grabbed her by the neck and shoved her against the wall again. As a result, DeGennaro suffered physical and emotional injuries requiring medical treatment.

One month later, at the urging of her co-workers, DeGennaro reported the February 15th incident to the police. On March 13, 1996, at about 11:00 p.m., she called the Newton Police department from her place of work. Officer Neil Casey was dispatched to the hospital to speak to her. DeGennaro described to him how defendant had choked her and how she had fought to break free of his hold. She also told Casey that since February 15th, defendant from time to time had called the hospital's security officers to inquire whether she was on duty. During that same period defendant repeatedly asked her to resume their romantic relationship and told her that "if he can't have her, nobody's going to have her." The last of such telephone calls had occurred several nights before the evening of DeGennaro's March 13th report to the police. Also, defendant's last telephone call to co-employees to determine whether she was working had occurred two days before, although on that occasion he neither went to the hospital nor attempted to speak to her.

According to Officer Casey, DeGennaro was agitated and nervous during her conversation with him. As DeGennaro described defendant's actions, she became more and more upset. He also noted that she appeared genuinely fearful for her life because of

defendant's statement that "if he can't have her, nobody's going to have her." Casey informed DeGennaro that she could seek a domestic violence restraining order. Accordingly, DeGennaro agreed to return with Casey to police headquarters to make such an application. There, in taking a statement from DeGennaro, Casey learned that defendant had several shotguns and pistols in his bedroom at his parents' Stillwater home where he resided. According to DeGennaro, some weapons were stored in a safe, and others were kept under defendant's mattress. A written statement incorporating that information was completed and signed by DeGennaro to support the complaint against defendant.

Officer Casey telephoned the municipal court judge to seek a TRO on an *ex parte* basis. During that telephone application, the judge spoke to both Casey and DeGennaro. However, the judge did not swear-in either individual nor did he administer an oath to either. The judge also did not tape or otherwise record the substance of his conversation with Casey and DeGennaro. Nonetheless, the record reveals that the judge determined that probable cause existed for issuance of an *ex parte* TRO. He instructed Casey to fill out the pre-prepared form order for a TRO and authorized the police to search for and seize weapons. We note that the warrant portion of the TRO, completed by Casey at the judge's instruction, contains a check-off at the line that directs defendant to turn over all weapons and permits to carry firearms. At that line, Officer Casey added language specifying the weapons as shotguns, pistols, and rifles. The record is unclear whether the judge specifically instructed Casey to add that language. Finally, the judge authorized execution of the TRO that night between 12:00 p.m. and 1:00 a.m. on March 14, 1996. Simultaneously, the judge issued a domestic violence complaint against defendant.

Officer Casey enlisted the assistance of the Stillwater Township police to serve the TRO on defendant and to seize his weapons. The officer and Patrolman Schetting arrived at defendant's residence at approximately 12:50 a.m. Defendant's father answered the door. They explained that a TRO had been issued against defendant, restraining him from any contact with DeGennaro, and

further that they were required to seize defendant's weapons. After being awakened, defendant spoke with the officers and allowed them to follow him to a backroom where he kept a safe. Thirty-five firearms were retrieved from the safe.[1] The officers also observed several large magazines in the safe, but did not seize them. They explained that they believed that the requirements of the TRO would be satisfied by removal of the weapons. The officers also searched under defendant's bed and inside a footlocker, but neither location yielded any weapons. The next day, at Officer Schetting's request, defendant agreed to turn over the magazines not taken the previous night.

Defendant was charged subsequently with the criminal offense of simple assault based on the February 15, 1996, choking incident. He was convicted on February 4, 1997. Approximately one month later, the domestic violence complaint against him was amended to include that incident and, based on defendant's assault conviction, a final restraining order (FRO) was entered. When defendant's conviction was later reversed on appeal, the FRO was dissolved by order dated June 13, 2000.

While the domestic violence proceedings were unfolding, defendant was indicted on five counts of third-degree unlawful possession of an assault firearm, contrary to *N.J.S.A.* 2C:39–5f, and six counts of fourth-degree unlawful possession of a large capacity magazine, contrary to *N.J.S.A.* 2C:39–3j. Defendant moved to suppress the firearm evidence obtained as a result of the March 14, 1996, execution of the TRO. The motion court concluded that the TRO was invalid because it was based on unsworn telephonic testimony. Nonetheless, the court found the search to be valid because of the presence of exigent circumstances and, therefore, denied suppression. The court further commented that permitting a search and seizure on serving a domestic violence restraining

---

[1] The State Police Firearms Investigation Unit inspected the weapons and determined that five of the weapons were possessed illegally: (1) a Colt AR–15; (2) an Uzi nine millimeter; (3) an AK–47; (4) a Model M–1A; and (5) a semi-automatic firing gun.

order was consistent with the public policy intentions of the Act, and, moreover, that defendant had consented to the seizure of the magazines. Following a two-day trial, a jury convicted defendant of four counts of third-degree unlawful possession of a firearm, and six counts of fourth-degree possession of a large capacity magazine. He was sentenced to concurrent three-year terms of probation on all of the firearm convictions, and concurrent two-year terms of probation on each of the magazine convictions.

The Appellate Division affirmed the convictions in an unpublished decision. Although the court recognized the defective nature of the process related to the issuance of the TRO and accompanying search warrant, it reasoned that the purpose of the search was not to discover evidence of criminal wrongdoing. Rather, the search was undertaken in furtherance of the Act's intent to provide maximum protection to domestic violence victims. In that setting, the court concluded that the Act requires only a standard of reasonableness for the search. That standard is met when the *ex parte* domestic violence TRO and authorized search further the protective purposes underlying the Act. The court determined that that standard was met in this case and that, in any event, the search was justified under the emergency-aid exception to the warrant requirement.

We granted defendant's petition for certification, 175 *N.J.* 80, 812 *A.*2d 1111 (2002), and now reverse.

## II.

In enacting the Prevention of Domestic Violence Act, the Legislature found and declared that domestic violence is more than an individual problem; it is an offense against society. *N.J.S.A.* 2C:25–18. The legislative findings recognize that domestic violence affects thousands of persons of all ages, sex, social and economic backgrounds, and ethnic origins. *Ibid.* To assure the safety of victims of domestic violence and that of the public, the Legislature declared its intention to authorize the maximum protection permissible under law. *Ibid.* Moreover, the Legislature stated its intent that relief be available promptly. *Ibid.*

Toward that end, the Act permits a domestic violence victim to apply for an emergency TRO on an *ex parte* basis. *N.J.S.A.* 2C:25-28f ("A municipal court judge or a judge of the Family Part of the Chancery Division ... may enter an *ex parte* order when necessary to protect the life, health or well-being of a victim on whose behalf the relief is sought"). The Act authorizes such temporary relief to "include forbidding the defendant from returning to the scene of the domestic violence, forbidding the defendant to possess any firearm or other weapon ..., ordering the search for and seizure of any such weapon at any location where the judge has reasonable cause to believe the weapon is located and any other appropriate relief." *N.J.S.A.* 2C:25-28j.

A TRO may be issued notwithstanding that the applicant is not physically present before the court, based "upon sworn testimony or complaint of an applicant who is not physically present, pursuant to court rules." *N.J.S.A.* 2C:25-28h. In such circumstances, the judge must be "satisfied that exigent circumstances exist sufficient to excuse the failure of the applicant to appear personally and that sufficient grounds for granting the application have been shown." *Ibid.* Thus, the Act expressly incorporates compliance with the court rules governing applications made by telephonic or other electronic means of communication. See *R.* 5:7A(b).

As we explained in *State v. Valencia,* 93 *N.J.* 126, 139, 459 *A.*2d 1149 (1983), the procedural requirements for a telephonic search warrant are fundamental to the substantive validity of the warrant. Only when "all of the procedural safeguards that we have outlined to assure the underlying reliability of the judge's decision to authorize the search have been met," will telephonic authorization be deemed "the functional equivalent of a written warrant." *Ibid.* Stated differently, we do not accord appellate deference to a judge's determinations upon the issuance of a telephonic warrant when those determinations lack the assurances of trustworthiness that we insist upon in the decisional process. *Id.* at 138, 459 *A.*2d 1149. The "warrant" simply is invalid.

Here, although the warrant to search defendant's home arose in the context of a domestic violence restraining order, for all intents and purposes it is a telephonic warrant and for purposes of a criminal prosecution must be judged by those standards. As noted, the State has conceded that the *Rule* 5:7A requirements for *ex parte* issuance of a TRO and warrant to search defendant's home were not satisfied.[2] Accordingly, because we are confronted with the use in a criminal prosecution of evidence seized pursuant to a defectively authorized search warrant, we regard that search as the equivalent of a warrantless search.[3] It can produce admissible evidence only if one of the exceptions to the warrant requirement applies.

## III.

### A.

■ The Fourth Amendment to the United States Constitution and Article I, paragraph 7 of the New Jersey Constitution require

---

[2] The municipal judge in this case did not take "contemporaneous record of the sworn oral testimony," nor did he take any "long hand notes summarizing what [was] said." Additionally, as already noted, there is no evidence that DeGennaro was ever sworn in or took an oath when she communicated her "testimony."

[3] It goes without saying that although failure to meet the technical and substantive requirements for a restraining order results in an invalid order, the order nonetheless has legal effect until vacated. See *Walker v. City of Birmingham*, 388 *U.S.* 307, 87 *S.Ct.* 1824, 18 *L.Ed.*2d 1210 (1967); *State v. Roberts*, 212 *N.J.Super.* 476, 515 *A.2d* 799 (App.Div.1986) (holding that defendant must obey court order even if order is later vacated for lack of jurisdiction); *State v. Masculin*, 355 *N.J.Super.* 250, 258, 809 *A.2d* 882 (Ch.Div.2002) (holding that defendant may not ignore procedurally defective temporary restraining order). Thus, even if an *ex parte* domestic violence TRO is issued pursuant to a flawed process, the person intended to be protected must receive the benefits of the order. A defendant must comply with the TRO's restraints and any search and seizure order contained therein, if only to challenge the validity of its respective parts in an appropriate forum later. In respect of the restraints, a defendant may obtain relief from the TRO under an expedited process set forth in the Act. See *N.J.S.A.* 2C:25–28i (authorizing immediate appeal for *de novo* hearing on challenge to TRO).

that police officers obtain a warrant "before searching a person's property, unless the search 'falls within one of the recognized exceptions to the warrant requirement.' " *State v. DeLuca,* 168 *N.J.* 626, 631, 775 *A.*2d 1284 (2001) (quoting *State v. Cooke,* 163 *N.J.* 657, 664, 751 *A.*2d 92 (2000)). A warrantless search of a person's home "must be subjected to particularly careful scrutiny," *State v. Bolte,* 115 *N.J.* 579, 560 *A.*2d 644 (1989), because "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is direct[ed]." *State v. Hutchins,* 116 *N.J.* 457, 463, 561 *A.*2d 1142 (1989) (quoting *United States v. United States Dist. Court,* 407 *U.S.* 297, 313, 92 *S.Ct.* 2125, 2134, 32 *L.Ed.*2d 752, 764 (1972)).

The predominant exception that courts have recognized is for "exigent circumstances." *Hutchins, supra,* 116 *N.J.* at 463, 561 *A.*2d 1142 (citing *Vale v. Louisiana,* 399 *U.S.* 30, 90 *S.Ct.* 1969, 26 *L.Ed.*2d 409 (1970)). Under that exception to the warrant requirement, exigent circumstances, coupled with the existence of probable cause, will excuse a police officer's failure to have secured a written warrant prior to a search for criminal wrongdoing. See *State v. Bruzzese,* 94 *N.J.* 210, 217–18, 463 *A.*2d 320 (1983); *Valencia, supra,* 93 *N.J.* at 136, 459 *A.*2d 1149. The doctrine lacks neatly defined contours. *See, e.g., State v. Nishina,* 175 *N.J.* 502, 516–17, 816 *A.*2d 153 (2003); *Cooke, supra,* 163 *N.J.* at 676, 751 *A.*2d 92. However, circumstances have been found to be exigent when they "preclude expenditure of the time necessary to obtain a warrant because of a probability that the suspect or the object of the search will disappear, or both." *State v. Smith,* 129 *N.J.Super.* 430, 435, 324 *A.*2d 62 (App.Div.), *certif. denied,* 66 *N.J.* 327, 331 *A.*2d 27 (1974). Obviously, in assessing for such exigency, courts must conduct a fact-sensitive and objective analysis, which has been described as including

[t]he degree of urgency and the amount of time necessary to obtain a warrant; the reasonable belief that the evidence was about to be lost, destroyed, or removed from the scene; the severity or seriousness of the offense involved; the possibility that a suspect is armed or dangerous; and the strength or weakness of the underlying probable cause determination.

[*DeLuca, supra*, 168 *N.J.* at 632–33, 775 *A.2d* 1284.]

 Courts also have permitted a warrantless search of a person's home by the police under an emergency aid exception to the warrant requirement.[4] See *State v. Garland*, 270 *N.J.Super.* 31, 44, 636 *A.2d* 541 (App.Div.1994). That exception contains three requirements:

> (1) the existence of an emergency as viewed objectively (2) a search not motivated by a desire to find evidence and (3) a nexus between the search and the emergency.
>
> [*State v. Scott*, 231 *N.J.Super.* 258, 275, 555 *A.2d* 667 (App.Div.1989) (Ashbey, J.A.D., concurring and dissenting) (citations omitted), *rev'd on dissent*, 118 *N.J.* 406, 571 *A.2d* 1304 (1990).]

In *Scott*, Judge Ashbey determined that the emergency aid exception applied in a situation where the victim called the police to remove the defendant pursuant to a restraining order. 231 *N.J.Super.* at 275, 555 *A.2d* 667. Judge Ashbey found that the victim's statements that she feared for the immediate safety of herself and her one-year-old child, coupled with the responding officer's personal knowledge of defendant's mental instability, were sufficient to trigger the emergency aid exception. *Id.* at 269–70, 555 *A.2d* 667.

 Accordingly, an emergency situation has been deemed to exist "[w]hen policemen, firemen, or other public officers are confronted with evidence which would lead a prudent and reasonable official to see a need to act on that information, even if ultimately found erroneous." *State v. Castro*, 238 *N.J.Super.* 482, 488, 570 *A.2d* 40 (App.Div.1990) (citing *Wayne v. United States*, 318 *F.2d* 205, 212 (D.C.Cir.1963), *cert. denied*, 375 *U.S.* 860, 84 *S.Ct.* 125, 11 *L.Ed.2d* 86 (1963)). Generally, courts have recog-

---

[4] The requirement of a warrant has been excused also under a "community caretaker doctrine," *State v. Garbin*, 325 *N.J.Super.* 521, 525, 739 *A.2d* 1016 (App.Div.1999), in which police are engaged in " 'functions, [which are] totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a statute.' " *State v. Navarro*, 310 *N.J.Super.* 104, 108, 708 *A.2d* 416 (App.Div.1998) (quoting *Cady v. Dombrowski*, 413 *U.S.* 433, 441, 93 *S.Ct.* 2523, 2528, 37 *L.Ed.2d* 706, 715 (1973)). The parties do not assert its applicability in this matter.

nized that the right of police officers "to enter and investigate in an emergency without the accompanying intent to either search or arrest is inherent in the very nature of their duties as police officers, and derives from the common law." *State v. Scott, supra,* 231 *N.J.Super.* at 274, 555 *A.*2d 667 (citations omitted).

## B.

The Appellate Division determined that the emergency aid exception applied in these circumstances and not the exception for exigency approved by the trial court. We conclude that neither exception applies.

■ We deal with exigency first. Here, there was no assertion to support a reasonable belief that evidence was about to be lost or destroyed. Although defendant was believed to possess firearms, there was no allegation that he had attempted or threatened to use them, and certainly no allegation to support an immediate threat. The incident of domestic violence, in and of itself a serious offense, had occurred a month before the search. Although the time elapsed might not necessarily reduce the risk to the safety of a domestic violence victim, as the Appellate Division noted, it does undercut the claim of exigency made by DeGennaro from her work place when she had not heard from defendant in days. Defendant had not appeared at the hospital that night nor had he contacted anyone to inquire whether DeGennaro was working. According to her statement, the last time defendant had done either had been days before. Simply put, the facts do not establish exigency such that a warrant was not needed. See *DeLuca, supra,* 168 *N.J.* at 632–33, 775 *A.*2d 1284.[5]

■ As for the emergency aid exception, it is undisputed that the police entry into the Cassidy home was not motivated by a

---

[5] Having concluded that the State has not met the first prong of the test for the exigency exception to the warrant requirement, we need not address the probable-cause prong.

desire to find evidence of a crime. The officers were there to serve the TRO and to search for and remove presumably lawful weapons from the home. Thus, this matter turns on whether there was an emergency that night, and if so, whether the police entry into the Cassidy home was related directly to the emergency. In respect of the first prong, the test is whether the evidence would have led a "prudent and reasonable officer" to perceive an immediate need to take action in order to prevent death or to protect against serious injury to persons or property. 3 Wayne LaFave, *Search & Seizure* § 6.6(a) at 391 (1996). Stated differently, the question is would the officers "have been derelict in their duty had they acted otherwise." *Id.* at 392.

Unlike other cases in which the emergency exception has been applied, the Cassidy home was not the scene of domestic violence that night; there was no active altercation with defendant underway when the police arrived at that location. DeGennaro had not seen defendant in weeks, nor had he made contact with her for days. The last incident of physical violence had occurred a month previous to her report of the matter to the police. Although there was a reasonable basis to believe that relief in the form of restraints was necessary to provide DeGennaro with the assurance of protection, the situation was not volatile at that moment as in *Scott, supra,* nor was the need to take immediate action at the Cassidy home objectively apparent.

We conclude that application of the emergency aid exception here would require an expansion of that doctrine. Were we to do so, that exception would eliminate the need to comply with the Act and its mechanisms for the protection of both domestic violence victims and those against whom complaints are alleged. To the extent that the Act provides greater protections, compliance with its procedural and substantive requirements is even more important.

The Act recognizes that, in certain circumstances, removal of weapons will be necessary to protect a victim. When an officer has "probable cause" to believe an act of domestic violence has

been committed, the officer may "question persons *present* to determine whether there are weapons *on the premises*" and seize any weapon that the officer reasonably believes would expose the victim to harm. *N.J.S.A.* 2C:25–21d (emphasis added). That language appears to contemplate that the questioning and removal of weapons will occur in the context of a response to the scene of an ongoing, or recent, act of domestic violence. Hence it would be more akin to the "live" emergency with which the police were confronted in *Scott, supra.* In this case there was no live emergency.

We do not mean to suggest, however, that a live emergency is the only context in which a seizure of weapons may be ordered pursuant to the Act. The need for compliance with the Act's mechanisms for proper issuance of an *ex parte* TRO becomes even more essential when the circumstances of the TRO application lack an obvious temporal connection to the violence. The record of the *ex parte* proceeding must disclose a proper basis for a finding of exigency for the telephonic application, probable cause to believe that the offense of domestic violence has occurred, and a reason to permit a search for weapons in a location removed from the place where the domestic violence allegedly occurred. Again, the proceeding before the issuing court below did not comply with those requirements and the emergency aid exception may not be used now to remedy the technical and substantive deficiencies of the warrant that authorized the search of defendant's home during the early morning hours of March 14, 1996. We adhere to the principle that regards "searches and seizures inside a home without a warrant a[s] presumptively unreasonable." *Hutchins, supra,* 116 *N.J.* at 463, 561 *A.*2d 1142 (quoting *Payton v. New York,* 445 *U.S.* 573, 586, 100 *S.Ct.* 1371, 1380, 63 *L.Ed.*2d 639, 651 (1980)).

Finally, we view the alleged consent given by defendant to the turning over of his magazines to suffer from the taint of the illegal search and seizure, notwithstanding that he consulted with an attorney prior to consenting. See *Wong Sun v. United States,* 371 *U.S.* 471, 485, 83 *S.Ct.* 407, 416, 9 *L.Ed.*2d 441, 453–54 (1963);

*State v. Rodriguez,* 172 *N.J.* 117, 132, 796 *A.*2d 857 (2002). In any case, that approach encourages full and prompt cooperation with the letter and spirit of domestic violence TROs, notwithstanding that a defendant must have an appropriate opportunity to challenge the use of such evidence in a later criminal prosecution unrelated to the domestic abuse charges.

## IV.

The judgment of the Appellate Division is reversed and defendant's convictions are vacated.

*For reversal and vacation*—Chief Justice PORITZ and Justices LONG, VERNIERO, LaVECCHIA, ZAZZALI, ABLIN, and WALLACE—7.

*Opposed*—None.