847 A.2d 561

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
GARY N. FRANKEL, DEFENDANT–APPELLANT.

Argued December 2, 2003—Decided May 12, 2004.

588

590

*William H. Buckman* argued the cause for appellant.

*Analisa Sama Holmes,* Deputy Attorney General, argued the cause for respondent (*Peter C. Harvey,* Attorney General of New Jersey, attorney).

*Philip G. Gallagher* argued the cause for amici curiae, Association of Criminal Defense Lawyers of New Jersey and American Civil Liberties Union of New Jersey (*Gibbons, Del Deo, Dolan, Griffinger & Vecchione,* attorneys; *Mr. Gallagher* and *Lawrence S. Lustberg,* on the brief).

Justice ALBIN delivered the opinion of the Court.

In this case, the Freehold Township Police Department received an open line 9–1–1 call from defendant's residence and dispatched a police officer to that address. Defendant advised the officer that he lived alone, did not make and could not account for the call, and would not consent to a search of his home so that the officer could satisfy himself that no one was in need of assistance. We must decide whether, under the totality of the circumstances, the officer's limited search of the home for a possible victim was justified under the emergency aid exception to the warrant requirement.

## I.

At approximately 7:27 a.m. on June 21, 1999, Freehold Township Police Dispatcher Darlene Ecks received a 9-1-1 call from the home of defendant Gary Frankel, but no one was on the other end of the line.[1] In response, Ecks dialed back the number from which the open line call[2] had originated and received a busy signal.[3]

Ecks then dispatched Officer Russell Gelber to defendant's house with the information that she had received a 9-1-1 call from that address and was unable to make contact with a resident. Officer Gelber arrived at defendant's house at approximately 7:46 a.m., and found a white sheet hanging behind the screen door blocking any view through the door or side windows. Defendant answered the knock at the door by poking his head out from behind the sheet, which he held back with one hand.[4] He appeared both surprised and nervous by the officer's presence. The officer informed defendant that he was responding to a 9-1-1 call and that the dispatcher was unable to make contact with anyone inside the house. With only his head visible, defendant told the

---

[1] The facts are derived from the motion to suppress hearing and are basically not in dispute.

[2] At the hearing, Ecks explained that an "open line" call includes when there is no one on the other end of the line and (1) there is no sound on the line; (2) there is static on the line; or (3) there is background noise because the caller put down the phone but did not hang it up.

[3] Before receiving the call from defendant's home, Ecks had already received three open line 9-1-1 calls from two different residences during her shift, one at 12:20 a.m., one at 3:05 a.m., and one at 7:06 a.m. The 9-1-1 call from defendant was the fourth open line call of Ecks's shift. She testified that she did not "believe there was anybody on the line on any of th[ose] calls." She did not tell Officer Gelber about the open line calls. Moreover, the record does not reveal whether those other open line 9-1-1 calls were generated by accidental, non-human means or by a person who dialed 9-1-1 either intentionally or inadvertently.

[4] Defendant, however, disputes that the sheet was between himself and Officer Gelber when he answered the door.

officer that he did not dial 9–1–1. When Officer Gelber suggested that perhaps someone inside the house dialed the number, defendant became nervous, tripped over his words, and explained that he lived alone. In turn, defendant's "nervousness was making [Officer Gelber] nervous." Without a full view of defendant, and out of concern for his own safety, Officer Gelber asked defendant to step out from behind the sheet. He patted down defendant to ensure that he had no weapons. Officer Gelber then asked defendant if he could check inside the house "to make sure everything was okay." The officer wanted to satisfy himself that a domestic violence victim or an injured person in need of assistance was not inside. Defendant displayed a look of shock and panic at the request, asked the officer whether he had a search warrant, and, learning that he did not, denied him consent to enter his home. Defendant also inquired whether he needed an attorney. Officer Gelber, who had never encountered anyone refusing such a "simple request" in his many responses to 9–1–1 calls and in view of defendant's agitated state, then radioed for backup out of concern for his own safety and fearing that someone inside the house was in danger.

While waiting for backup, the officer and defendant conversed on the porch. Defendant explained that he had been using his computer that morning and that the computer might have "inadvertently dialed 911."[5] In response to the officer's question whether he had anything inside that he did not want seen, defendant "indicated that there was some sexual stuff inside the residence and he was embarrassed." Officer Gelber confirmed the telephone number that generated the 9–1–1 call and then radioed the dispatcher to dial back that number. The dispatcher did so and informed Officer Gelber that all she received was a busy

---

[5] Defendant maintained two telephone lines in his home, one of which was dedicated to his computer. Although the 9–1–1 call center's records show the 9–1–1 call did not originate from the computer line, defendant's expert reported that the computer might have contributed to an electronic malfunction that created the 9–1–1 signal.

signal. This information confirmed in Officer Gelber's mind that there might be "somebody inside the house." Defendant, who had overheard the dispatcher's radio transmission, asked the officer if he could retrieve his cordless telephones from his home. Officer Gelber permitted defendant to enter for that purpose and defendant gave the officer consent to post himself in the foyer while he did so. While in the foyer, Officer Gelber observed two rooms, one unfurnished and the other partially furnished with a couch and television. The officer noted that in the partially furnished room a lawn chair was propped up against a sliding glass door from the outside, creating a possible obstacle to anyone trying to enter or exit the house. Although defendant walked down the hallway out of Officer Gelber's sight, he reappeared within seconds with two cordless telephones and stated that one was for each line in his house.

Defendant then led the officer back outside the house where he used the telephone purportedly from his computer line to dial the telephone from which the 9-1-1 call originated. The telephone rang, indicating that the line was no longer busy. The demonstration, however, did not lessen Officer Gelber's suspicions because defendant could have taken the telephone from a person incapacitated in the house.

At approximately 8:00 a.m., after Freehold Township Police Officer Dean Smith arrived at defendant's house, Officer Gelber decided to enter the house "to make sure that [defendant] was alone and that there was nobody else that really needed help in there." He based his decision on the totality of the circumstances known to him: the original open line 9-1-1 call, the two callbacks by the dispatcher that elicited busy signals, defendant's nervous and agitated state, and his general observations of the house. Officer Smith stayed with defendant while Officer Gelber conducted a search limited to those areas where a person or body could be concealed. Officer Gelber did not search through drawers or containers for personal effects. During the search, Officer Gelber discovered in plain view marijuana on a tray inside a closet in one

room; marijuana plants and an ultraviolet grow light in a bathroom; and marijuana plants, grow lights, and an elaborate watering system in a room in the basement. Officer Gelber did not find anyone in the house. The officers then placed defendant under arrest and secured a warrant to search the house.

Robert Bulthaupt, Bell Atlantic's team leader for the 9–1–1 control center, testified that between two and five percent of all 9–1–1 calls are generated accidentally by non-human means such as by cordless phones with low batteries, answering machines, computer modems, and repair work on telephone lines. Defendant testified that he did not call 9–1–1 on the morning of June 21. His telephone bill indicated that he was using his computer modem to dial into work at 7:26 a.m., the exact time the dispatcher received the 9–1–1 call from defendant's primary telephone line. The State did not dispute that the 9–1–1 call was triggered by some accidental, non-human means, probably related to the operation of defendant's computer.

Defendant was charged in a two-count indictment with possession of marijuana, a fourth-degree offense in violation of *N.J.S.A.* 2C:35–10a(3), and operation of a premise, place, or facility used for the manufacture of marijuana, a first-degree offense in violation of *N.J.S.A.* 2C:35–4.

The trial court granted defendant's motion to suppress related to the discovery of the marijuana evidence. In rejecting the application of the emergency aid exception as a justification for the warrantless search of defendant's home, the court found that defendant did not dial 9–1–1, and that defendant's nervous behavior and the busy signals received by the dispatcher on the callbacks as well as Officer Gelber's honest and subjective belief that an emergency existed were not sufficient to establish probable cause to search the house. The court concluded that "more compelling facts are needed to justify a warrantless search following an open line 9–1–1 call."

The Appellate Division granted the State's motion for leave to appeal and reversed the suppression order. 341 *N.J.Super.* 594,

775 *A*.2d 665 (App.Div.2001). The appellate panel held that given the totality of the circumstances Officer Gelber had an objectively reasonable basis under the emergency aid doctrine to conduct a warrantless search of defendant's home. In reaching that conclusion, the panel afforded considerable weight to the importance of prompt police response to 9–1–1 calls and the need for police to act decisively in emergency situations.

After this Court denied defendant's motion for leave to appeal, defendant entered into a conditional plea agreement with the State, preserving the suppression issue for appeal. Defendant pled guilty to the possession of marijuana charge in exchange for the State's pledge to dismiss the first-degree charge of operating a marijuana production facility and to recommend a noncustodial term.

In accordance with the plea agreement, the trial court sentenced defendant to a two-year probationary term on the condition that he maintain full-time employment and undergo random drug testing. The court also ordered defendant to perform fifty hours of community service, imposed $955 in penalties and fees, and suspended his driver's license for six months.

Defendant appealed the suppression issue and the Appellate Division summarily affirmed based on the law of the case doctrine. We granted defendant's petition for certification, 176 *N.J.* 430, 824 *A*.2d 159 (2003), and now affirm.

## II.

The Fourth Amendment of the United States Constitution and Article 1, Paragraph 7 of the New Jersey Constitution prohibit "unreasonable searches and seizures" by government officials,[6] and our constitutional jurisprudence expresses a prefer-

---

[6] The Fourth Amendment to the United States Constitution and Article I, Paragraph 7 of our State Constitution use virtually identical language. The Fourth Amendment provides:

ence that those officials secure warrants issued by neutral and detached magistrates before executing a search, particularly of a home. *Johnson v. United States,* 333 *U.S.* 10, 14, 68 *S.Ct.* 367, 369, 92 *L.Ed.* 436, 440 (1948); *State v. Sullivan,* 169 *N.J.* 204, 210, 777 *A.*2d 60 (2001); *State v. Kasabucki,* 52 *N.J.* 110, 115–16, 244 *A.*2d 101 (1968). A search conducted without a warrant is presumptively invalid, and the burden falls on the State to demonstrate that the search is justified by one of the "few specifically established and well-delineated exceptions" to the warrant requirement. *Mincey v. Arizona,* 437 *U.S.* 385, 390, 98 *S.Ct.* 2408, 2412, 57 *L.Ed.*2d 290, 298–99 (1978) (quoting *Katz v. United States,* 389 *U.S.* 347, 357, 88 *S.Ct.* 507, 514, 19 *L.Ed.*2d 576, 585 (1967)); *see also United States v. Karo,* 468 *U.S.* 705, 717–18, 104 *S.Ct.* 3296, 3304, 82 *L.Ed.*2d 530, 542–43 (1984); *State v. Bolte,* 115 *N.J.* 579, 585, 560 *A.*2d 644 (1989), *cert. denied,* 493 *U.S.* 936, 110 *S.Ct.* 330, 107 *L.Ed.*2d 320 (1989); *State v. Alston,* 88 *N.J.* 211, 230, 440 *A.*2d 1311 (1981). Those exceptions are based on the recognition that under certain exigent circumstances a search without a warrant is both reasonable and necessary. *See, e.g., Chimel v. California,* 395 *U.S.* 752, 762–64, 89 *S.Ct.* 2034, 2039–41, 23 *L.Ed.*2d 685, 694–95 (1969); *Terry v. Ohio,* 392 *U.S.* 1, 29–31, 88 *S.Ct.* 1868, 1884, 20 *L.Ed.*2d 889, 911 (1968).

In this case, we address the contours of the emergency aid exception to the warrant requirement. The emergency aid doctrine is derived from the commonsense understanding that exigent circumstances may require public safety officials, such as the police, firefighters, or paramedics, to enter a dwelling without a warrant for the purpose of protecting or preserving life, or preventing serious injury. *See Mincey, supra,* 437 *U.S.* at 392, 98

---

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

[*U.S. Const.* amend. IV.]

*See also N.J. Const.* art. I, ¶ 7.

*S.Ct.* at 2413, 57 *L.Ed.*2d at 300; *State v. Stott,* 171 *N.J.* 343, 361, 794 *A.*2d 120 (2002). The Fourth Amendment and Article 1, Paragraph 7 do not demand that public safety officials stand by in the face of an imminent danger and delay potential lifesaving measures while critical and precious time is expended obtaining a warrant. *See Mincey, supra,* 437 *U.S.* at 392, 98 *S.Ct.* at 2418, 57 *L.Ed.*2d at 300 (1978); *Stott, supra,* 171 *N.J.* at 361, 794 *A.*2d 120. We examine the conduct of those officials in light of what was reasonable under the fast-breaking and potentially life-threatening circumstances that were faced at the time. *See Terry, supra,* 392 *U.S.* at 21–22, 88 *S.Ct.* at 1880, 20 *L.Ed.*2d at 906; *see also Earle v. United States,* 612 *A.*2d 1258, 1263 (D.C.1992). We avoid viewing the events through the distorted prism of hindsight, recognizing that those who must act in the heat of the moment do so without the luxury of time for calm reflection or sustained deliberation. *See Wayne v. United States,* 318 *F.*2d 205, 212 (D.C.Cir.), *cert. denied,* 375 *U.S.* 860, 84 *S.Ct.* 125, 11 *L.Ed.*2d 86 (1963); *see also State v. Leandry,* 151 *N.J.Super.* 92, 96, 376 *A.*2d 574 (App.Div.), *certif. denied,* 75 *N.J.* 532, 384 *A.*2d 511 (1977).

 The emergency aid doctrine only requires that public safety officials possess an objectively reasonable basis to believe—not certitude—that there is a danger and need for prompt action. *See State v. Cassidy,* 179 *N.J.* 150, 161, 163, 843 *A.*2d 1132 (2004); *Wayne, supra,* 318 *F.*2d at 212. That the perceived danger, in fact, may not have existed does not invalidate the reasonableness of the decision to act at the time. *Cassidy, supra,* 179 *N.J.* at 161, 843 *A.*2d 1132; *Wayne, supra,* 318 *F.*2d at 212.

 The scope of the search under the emergency aid exception is limited to the reasons and objectives that prompted the search in the first place. *See Terry, supra,* 392 *U.S.* at 19–20, 88 *S.Ct.* at 1879, 20 *L.Ed.*2d at 905. A police officer entering a home looking for a person injured or in danger may not expand the scope of the search by peering into drawers, cupboards, or waste-paper baskets. However, evidence observed in plain view by a public safety official who is lawfully on the premises and is not

exceeding the scope of the search will be admissible. *Mincey, supra,* 437 *U.S.* at 393, 98 *S.Ct.* at 2413, 57 *L.Ed.*2d at 300.

The rationale for the emergency aid exception is found in the oft-quoted words of Chief Justice (then Judge) Burger in *Wayne v. United States, supra:*

> [A] warrant is not required to break down a door to enter a burning home to rescue occupants or extinguish a fire, to prevent a shooting or to bring emergency aid to an injured person. The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency. Fires or dead bodies are reported to police by cranks where no fires or bodies are to be found. Acting in response to reports of "dead bodies," the police may find the "bodies" to be common drunks, diabetics in shock, or distressed cardiac patients. But the business of policemen and firemen is to act, not to speculate or meditate on whether the report is correct. People could well die in emergencies if police tried to act with the calm deliberation associated with the judicial process. Even the apparently dead often are saved by swift police response.
>
> [318 *F.*2d at 212.]

■ We have adopted a three-prong test to determine whether a warrantless search by a public safety official is justified under the emergency aid doctrine. See *Cassidy, supra,* 179 *N.J.* at 161, 843 *A.*2d 1132 (quoting *State v. Scott,* 231 *N.J.Super.* 258, 275, 555 *A.*2d 667 (App.Div.1989) (Ashbey, J.A.D., concurring and dissenting), *rev'd on dissent,* 118 *N.J.* 406, 571 *A.*2d 1304 (1990)). Under that test, the public safety official must have an objectively reasonable basis to believe that an emergency requires that he provide immediate assistance to protect or preserve life, or prevent serious injury;[7] his primary motivation for entry into the home must be to render assistance, not to find and seize evidence; and there must be a reasonable nexus between the emergency and the area or places to be searched. *Ibid.; see also State v. Navarro,* 310 *N.J.Super.* 104, 108, 708 *A.*2d 416 (App.Div.1998).

---

[7] Although there is no need in this case to address the application of the emergency aid doctrine to the protection of property, we note that our case law extends the doctrine to the protection of property. See *Cassidy, supra,* 179 *N.J.* at 163, 843 *A.*2d 1132. One expects firefighters to rush into a building to put out a fire regardless of whether people are on the premises.

Our courts have applied the emergency aid doctrine in some straightforward fact patterns. In *State v. Garbin,* a police officer responded to a home on the report of a fire. 325 *N.J.Super.* 521, 524, 739 *A.*2d 1016 (App.Div.1999), *certif. denied,* 164 *N.J.* 560, 753 *A.*2d 1153 (2000). He observed smoke coming from a garage and smelled burning rubber. *Ibid.* The officer entered the garage, observed the wheels of the truck spinning rapidly, and found the driver intoxicated. *Id.* at 524, 527, 739 *A.*2d 1016. The Appellate Division found that the officer's observations prior to entering the garage "could have indicated that the car was stuck in a driving gear, that the driver was unconscious or attempting to commit suicide or ... that he was highly intoxicated." *Id.* at 527, 739 *A.*2d 1016. Accordingly, the panel upheld the warrantless entry into the garage based on the officer's community caretaking function, recognizing that the officer would have been derelict had he failed to act under those circumstances. *Ibid.*

In *State v. Garland,* after a routine motor vehicle stop, a police officer seized drugs in the car and arrested the driver. 270 *N.J.Super.* 31, 37, 636 *A.*2d 541 (App.Div.), *certif. denied,* 136 *N.J.* 296, 642 *A.*2d 1005 (1994). The passenger, a seven-year-old girl, informed the officer that the driver was her mother's friend and that two young children had been left alone at a nearby motel, which was known by the officer for its reputation for prostitution. *Id.* at 36–38, 45, 636 *A.*2d 541. As a result of that information, police officers went to the motel room. *Id.* at 38, 636 *A.*2d 541. They knocked on the door, but received no response. *Ibid.* After hearing voices inside, the officers entered the room with the use of a key. *Id.* at 38–39, 636 *A.*2d 541. Inside they found several adults, two children, and in plain view a large quantity of cocaine. *Id.* at 39, 636 *A.*2d 541. Based on the application of the emergency aid doctrine to the warrantless entry, the Appellate Division affirmed the denial of a motion to suppress. *Id.* at 45–46, 636 *A.*2d 541.

*Garbin* and *Garland* are classic examples of the application of the emergency aid doctrine. In both cases, police officers either

observed or received reliable information that indicated a clear and present danger. Unlike those cases, we did not find the emergency aid doctrine applicable in *State v. Cassidy, supra,* 179 *N.J.* at 162, 843 *A.*2d 1132. In that case, Natalie DeGennaro contacted the police from her place of employment concerning a history of domestic violence with the defendant, a former boyfriend. *Id.* at 153–55, 843 *A.*2d 1132. As a result of that information, the police applied for and received a warrant to search defendant's home for weapons. *Id.* at 155, 843 *A.*2d 1132. We found that warrant to be procedurally defective. *Id.* at 159, 164, 843 *A.*2d 1132. Alternatively, the State sought to justify the warrantless search of the defendant's home based on the emergency aid doctrine. *Id.* at 162, 843 *A.*2d 1132. We rejected that application of the emergency aid doctrine because there was no clear and imminent danger, stating:

> Unlike other cases in which the emergency exception has been applied, the [defendant's] home was not the scene of domestic violence that night; there was no active altercation with defendant underway when the police arrived at that location. DeGennaro had not seen defendant in weeks, nor had he made contact with her for days. The last incident of physical violence had occurred a month previous to her report of the matter to the police. Although there was a reasonable basis to believe that relief in the form of restraints was necessary to provide DeGennaro with the assurance of protection, the situation was not volatile at that moment ..., nor was the need to take immediate action at the [defendant's] home objectively apparent.
>
> [*Id.* at 163, 843 *A.*2d 1132.]

In *Cassidy,* the police knew that Ms. DeGennaro was not in any immediate danger because at the time of her call to the police, she was far from the defendant and his home. *Id.* at 163–64, 843 *A.*2d 1132. In contrast, in this case, Officer Gelber had a reasonable belief that some unknown person was in need of assistance in defendant's house and that any delay could have fatal consequences. Though the potential danger was inferred from the circumstances surrounding the transmission of the open line 9–1–1 call to a police dispatcher, that danger was no less real than if it had been perceived by or verbally communicated directly to Officer Gelber.

## B.

In determining the legality of the search in this case, we must decide what weight to accord an open line 9-1-1 call. In assessing that issue, we first survey the purpose and use of 9-1-1 as an emergency response mechanism. 9-1-1 is "the universal emergency telephone number within the United States for reporting an emergency to appropriate authorities and requesting assistance." 47 *U.S.C.A.* § 251(e)(3). "A 9-1-1 call is one of the most common ... means through which police and other emergency personnel learn that there is someone in a dangerous situation who urgently needs help." *United States v. Richardson,* 208 *F.*3d 626, 630 (7th Cir.), *cert. denied,* 531 *U.S.* 910, 121 *S.Ct.* 259, 148 *L.Ed.*2d 188 (2000); *see also United States v. Holloway,* 290 *F.*3d 1331, 1339 (11th Cir.2002) ("911 calls are the predominant means of communicating emergency situations."), *cert. denied,* 537 *U.S.* 1161, 123 *S.Ct.* 966, 154 *L.Ed.*2d 897 (2003).

New Jersey has a detailed statutory and regulatory scheme for the implementation of the 9-1-1 system throughout the State.[8] See *N.J.S.A.* 52:17C-1 to -16; *N.J.A.C.* 17:24-1.1 to -11.4. See also *N.J.S.A.* 52:17C-3a, -3b, -8a (establishing Office of Emergency Telecommunications Services to implement "an enhanced 9-1-1 system," to "explore ways to maximize the reliability of the system," and to expedite communications of emergencies to "law enforcement, fire fighting, emergency medical services, or other emergency services"). Telephone companies are required to

---

[8] The regulations provide "operational standards," including requirements that all 9-1-1 answering centers have "no more than one busy signal in 100 call attempts in the average busiest hour"; all answering centers "operate[ ] on a full-time basis, 24 hours a day, seven days a week"; and all 9-1-1 calls be "answered in 10 seconds, except that 10 percent of the calls received during the average busiest hour may be answered within 20 seconds." *N.J.A.C.* 17:24-2.3. The regulations also require the word "EMERGENCY" to appear whenever 9-1-1 is displayed so as "to promote the proper use of 9-1-1 services," *N.J.A.C.* 17:24-10.2(b)(2), and require anyone who publishes a telephone listing that includes emergency numbers to "list '9-1-1' as the only 'Emergency' number," *N.J.A.C.* 17:24-10.1.

forward the telephone number and street address of any telephone used to place a 9-1-1 call to 9-1-1 dispatchers "for the purpose of responding to emergency calls." *N.J.S.A.* 52:17C-10a. Upon receiving such a call, the dispatcher must answer with a response such as "9-1-1, where is the emergency?" *N.J.A.C.* 17:24-2.3(a)(5). "The police maintain records of 9-1-1 calls not only for the purpose of responding to emergency situations but to investigate false or intentionally misleading reports." *State v. Golotta,* 178 *N.J.* 205, 219, 837 *A.*2d 359 (2003); *see also N.J.S.A.* 52:17C-10a. Moreover, the use of 9-1-1 to falsely report an emergency is a crime. *N.J.S.A.* 2C:33-3e (providing that "[a] person is guilty of a crime of the fourth degree if the person knowingly places a call to a 9-1-1 emergency telephone system without purpose of reporting the need for 9-1-1 service"). A 9-1-1 call carries "a fair degree of reliability," because "it is hard to conceive that a person would place himself or herself at risk of a criminal charge by making such a call," unless there was a true emergency. *Golotta, supra,* 178 *N.J.* at 219, 837 *A.*2d 359 (internal quotation marks omitted).

More than ninety-five percent of all 9-1-1 calls received by police departments are a result of a person dialing that number. That only two to five percent of such calls are generated accidentally by non-human means in no way diminishes the probability that a 9-1-1 call is the signal of an emergency. *See Richardson, supra,* 208 *F.*3d at 630 ("Many 911 calls are inspired by true emergencies that require an immediate response."). An open line 9-1-1 call, by its very nature, may fairly be considered an SOS call, a presumptive emergency, requiring an immediate response. That presumption must apply because the dispatcher does not know whether the caller is a stroke or heart attack victim, a child in need of assistance, a person overcome by smoke or, more generally, a person whose life is endangered but unable to speak. That presumption is rebuttable and may be dispelled by any number of simple explanations given by the homeowner to the responding police officer. A mother may explain that her child,

who appears at the door with her, impishly dialed the number. A resident, who otherwise raises no suspicions, may state that he intended to call 4–1–1 but pushed the wrong digit and due to distraction inadvertently left the telephone off the hook. Those circumstances when viewed in their totality would likely persuade a reasonable police officer that there is no need for further investigation. Conversely, the circumstances confronting the public safety official may corroborate the existence of an emergency. For example, smoke escaping from under a door might be a clear sign of a fire.

We reject the State's request that we "find, as a matter of law, that the receipt of a 9–1–1 open-line, abandoned or hang-up call *alone* gives the police the 'reasonable belief' grounds necessary to enter a home to investigate the nature of the emergency." (Emphasis added.) Likewise, we cannot accept defendant's position that an open line 9–1–1 call, followed by callbacks by the dispatcher that only elicit busy signals and a visit to the home by a police officer whose knock on the door goes unanswered, would *never* be sufficient to justify entry as part of the officer's emergency caretaking function. We eschew the absolute positions advanced by both the State and defendant for a more nuanced approach that properly weighs the competing interests under a totality of the circumstances standard.

It does not require a flight of imagination to picture circumstances in which a person who suddenly takes ill dials 9–1–1 and is incapacitated and unable to speak. The police officer at the door, of course, cannot know what type of emergency, if any, lies inside—all he knows is that the caller has dialed an emergency response number. In light of the presumptive emergency, we cannot conclude that the officer is bound to ignore the warning and walk away. Each case must be decided on the totality of the circumstances confronted by the public safety official, who must weigh the competing values at stake, the privacy interests of the home versus the interest in acting promptly to render potentially life-saving assistance to a person who may be incapacitated.

There is no bright line or magic formula to be applied across the board. A fact-sensitive analysis must be applied to each case.

## C.

Several out-of-state cases that have addressed comparable exigent situations involving the emergency aid doctrine are informative to our resolution of the present case.[9] In *People v. Greene,* 289 *Ill.App.*3d 796, 799, 224 *Ill.Dec.* 793, 682 *N.E.*2d 354 (1997), a police dispatcher received a 9–1–1 hang-up call and on redial was connected with an answering machine. The dispatcher sent officers to the residence identified with the call. *Id.* at 800, 224 *Ill.Dec.* 793, 682 *N.E.*2d 354. After the officers knocked on the screen door to the defendant's porch and received no response, they opened that door and proceeded to the front door. *Id.* at 800, 803, 224 *Ill.Dec.* 793, 682 *N.E.*2d 354. Although it was disputed whether the officers broke the eyehook that locked the door, *id.* at 799, 801, 224 *Ill.Dec.* 793, 682 *N.E.*2d 354, the appellate court found that the officers made "a peaceful entry onto the porch," which was "justified" for the purpose of making contact with the resident, *id.* at 803, 224 *Ill.Dec.* 793, 682 *N.E.*2d 354. Through the front door's window, the officers observed the defendant seated on a couch in the living room. *Id.* at 800, 224 *Ill.Dec.* 793, 682 *N.E.*2d 354. After the officers knocked on the door and announced their presence, the defendant walked to the door, engaged the dead bolt lock, and returned to the couch, apparently

---

[9] In addition to the cases discussed below, see *United States v. Richardson, supra,* 208 *F.*3d at 627–28, 631 (upholding warrantless search of defendant's home because, although 9–1–1 call reported that body of woman who had been raped and murdered could be found in defendant's basement, police did not have to presume woman was dead); *State v. Greene,* 162 *Ariz.* 431, 432, 784 *P.*2d 257 (Ariz.1989) (upholding officer's warrantless entry into defendant's apartment based on receipt of "a 'family fight-domestic violence' call"); *State v. Lynd,* 54 *Wash.App.* 18, 19, 771 *P.*2d 770 (Wash.Ct.App.1989) (upholding warrantless search under emergency aid exception where dispatcher received 9–1–1 hang-up call and busy signal on callback, and defendant admitted that he and his wife had been engaged in incident of domestic violence and claimed his wife was no longer at home).

hiding something under a cushion. *Id.* at 800, 803, 224 *Ill.Dec.* 793, 682 *N.E.*2d 354. The officers persisted in knocking on the door until the defendant answered. *Id.* at 800, 224 *Ill.Dec.* 793, 682 *N.E.*2d 354. The officers then told the defendant that they had received a 9–1–1 call from his house, to which the defendant replied that he had not called 9–1–1 and that he was alone in the house.[10] *Ibid.* Upon entering the defendant's home, the odor of burning marijuana was strong, and one of the officers proceeded to lift the couch cushion under which the officers had observed the defendant secrete an unknown object, possibly a weapon. *Ibid.* The officer discovered a small quantity of marijuana. *Id.* at 799–800, 224 *Ill.Dec.* 793, 682 *N.E.*2d 354. The court found that entry into the house, even absent consent, was justified under the emergency aid doctrine. *Id.* at 803, 224 *Ill.Dec.* 793, 682 *N.E.*2d 354. The court concluded that the totality of the circumstances "made it reasonable for the police to believe that someone within the house was attempting to call 911 for help but was prevented from completing the call." *Ibid.*

In *State v. Pearson–Anderson,* 136 *Idaho* 847, 848, 41 *P.*3d 275 (Idaho Ct.App.2001), a 9–1–1 emergency operator traced a hang-up call to the defendant's home. When the operator redialed the telephone number that originated the 9–1–1 call, someone picked up the line and immediately hung up. *Ibid.* Two police officers were dispatched to the residence and observed the defendant and her live-in boyfriend wrestling on the floor across the threshold of the backdoor. *Ibid.* After separating the two combatants, defendant told one of the officers that "the fight arose because [her boyfriend] had given a key to the home to another woman," who had entered and damaged some of the defendant's belongings. *Ibid.* She also related that "the other woman had been there 'earlier,'" but had left. *Ibid.* One of the officers decided to enter the home to determine whether any third parties were in need of

---

[10] The defendant later claimed that he may have inadvertently dialed 9–1–1 while attempting to dial area code 901. *Id.* at 800, 224 *Ill.Dec.* 793, 682 *N.E.*2d 354.

assistance. *Id.* at 849, 41 *P.*3d 275. Although he found no one in distress, he happened upon a methamphetamine factory. *Ibid.* The court reasoned that the initial 9–1–1 hang-up call and the redial hang up "suggested that someone in the home who was in need of help had been prevented by another person from communicating with the operator." *Id.* at 850, 41 *P.*3d 275. The court rejected the defendant's invitation to hold that responding police officers must take the word of a person at the scene who offers a seemingly plausible explanation for the hang up and gives assurances that no one is in distress. *Ibid.* The court concluded that the entry was reasonable in light of the totality of the circumstances. *Id.* at 851, 41 *P.*3d 275.

In *United States v. Barone,* 330 *F.*2d 543, 544 (2d Cir.1964), *cert. denied,* 377 *U.S.* 1004, 84 *S.Ct.* 1940, 12 *L.Ed.*2d 1053 (1964), several New York City patrolmen heard "loud screams in the dead of night" coming from a rooming house. The officers knocked on the door to the room from which the screams had emanated and were greeted by two women, both of whom denied knowledge of the cause of the screams, though one suggested that she might have suffered a nightmare. *Ibid.* After the officers observed the defendant emerge from a bathroom in the wake of the sound of a flushing toilet, they entered that room and found in plain view counterfeit currency. *Ibid.* The court upheld the search, concluding that the officers had reason to believe that someone within the apartment was the victim of an assault. *Ibid.* The court in applying the emergency aid doctrine found that "had the patrolmen been denied entry to the apartment they would have had the right, if not the duty, to gain entry forcibly." *Id.* at 545. The court concluded that the search to find the cause of the screaming "would have been incomplete without finding out who might be in the bathroom and whether anyone there might be in need of aid." *Ibid.*

Certain general principles may be distilled from those cases. A 9–1–1 call is tantamount to a distress call even when there is no verbal communication over the telephone to describe

the nature of the emergency. The responding police officer is not required to accept blindly the explanation for the 9-1-1 call offered by the resident answering the door, but must base his decision on the totality of the circumstances. Courts are loath to second-guess decisions made in good faith with the intent of protecting life when the circumstances clearly reveal a legitimate emergency that will not abide delay.

### III.

Against this legal backdrop, we analyze the facts before us. The police dispatcher received an open line 9-1-1 call from a telephone number listed in defendant's name and then after dialing back that number heard only a busy signal. The dispatcher acted promptly when she could not make contact with the person who initiated the 9-1-1 call. Officer Gelber proceeded to defendant's home to investigate. From the officer's perspective, as a result of the open line 9-1-1 call and the inability to make contact with the caller, he had a duty to presume there was an emergency. In response to Officer Gelber's knock at the door, defendant responded by poking his head from behind a sheet that obstructed a view of the interior of the house and then advising the officer that he lived alone and did not make the call. The failure of defendant to give a reasonable account for the call at that time naturally aroused the suspicion of the officer. The dispatcher's second call to the house, which yielded another busy signal, reinforced in the officer's mind the very real potential that a victim was incapacitated in the home. In addition, Officer Gelber noted that defendant was unusually nervous and agitated and stumbling over his words when first asked to explain the occurrence of a 9-1-1 call from his home. Officer Gelber did not have to give uncritical acceptance to defendant's belated explanation that his computer modem may have caused a false 9-1-1 transmission or to defendant's demonstration that he could call without a busy signal from one cordless telephone to another.

Upon reentering his home, defendant could have retrieved the telephone from a victim rendered helpless.

That there are a small percentage of non-human generated 9-1-1 calls and 9-1-1 calls that are made inadvertently does not place in doubt the overall reliability of the 9-1-1 emergency response system or lessen the significance of any one open line call. Public safety officials must respond to every open line 9-1-1 call as though a true emergency is unfolding. We must decide whether Officer Gelber was "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant[ed]" his entry into defendant's home under the emergency aid doctrine. *Terry, supra*, 392 *U.S.* at 21, 88 *S.Ct.* at 1880, 20 *L.Ed.*2d at 906. As in *Greene, supra*, 289 *Ill.App.*3d at 803, 224 *Ill.Dec.* 793, 682 *N.E.*2d 354, and *Pearson–Anderson, supra*, 136 *Idaho* at 850, 41 *P.*3d 275, Officer Gelber was entitled to conclude that the person who attempted to make the 9-1-1 call may have been prevented from completing the call and was in need of emergency assistance. We find that Officer Gelber had an objectively reasonable and good-faith basis to believe that an emergency was at hand that could not brook delay. Moreover, we find that the officer's motivation for entering the home was transparent—to ensure that a victim was not lying somewhere within the house. There was no credible evidence that the officer harbored the ulterior motive of hunting for evidence of a crime to pin against defendant. The scope of Officer Gelber's search was limited to the emergent mission—looking into areas where a person or body could be located. The officer could not ignore the evidence of drug activity that he observed in plain view. *See Mincey, supra*, 437 *U.S.* at 393, 98 *S.Ct.* at 2413, 57 *L.Ed.*2d at 300. Both the basis for and scope of the search were within constitutional bounds and, therefore, the motion to suppress should have been denied.

In affirming the Appellate Division and upholding the search, we give no weight to Officer Gelber's testimony that a resident had never before declined to grant him entry to a home

when he was responding to a 9-1-1 call, or that defendant told the officer that he could not enter without a search warrant, or that defendant asked if he needed a lawyer. A homeowner has a right under our federal and state constitutions to insist that a police officer obtain a warrant before entering and searching his house. *See State v. Bolte, supra,* 115 *N.J.* at 583–84, 560 *A.*2d 644; *see also Schneckloth v. Bustamonte,* 412 *U.S.* 218, 219, 93 *S.Ct.* 2041, 2043–44, 36 *L.Ed.*2d 854, 858 (1973) (discussing consent exception to warrant requirement); *State v. Suazo,* 133 *N.J.* 315, 319–20, 627 *A.*2d 1074 (1993) (same). The assertion of that constitutional right, which protects the most basic privacy interests of our citizenry, is not probative of wrongdoing and cannot be the justification for the warrantless entry into a home. *See United States v. Alexander,* 835 *F.*2d 1406, 1409 n. 3 (11th Cir.1988) (stating that "defendant's refusal to consent to search cannot establish probable cause to search"); *United States v. Prescott,* 581 *F.*2d 1343, 1350 (9th Cir.1978) (stating that defendant's refusal to consent to entry and search by police officers "cannot be a crime" and cannot "be evidence of a crime"); *see also* Craig S. Lerner, *The Reasonableness of Probable Cause,* 81 *Tex. L.Rev.* 951, 966 (2003) (noting that courts "have suggested that allowing the police to weigh a refusal to consent impermissibly 'burdens' the exercise of the Fourth Amendment right to be free from unreasonable searches"). While we in no way suggest that the public should not cooperate with the police, a person's assertion of a constitutional right should not be used to cast suspicion on him and serve as the excuse to diminish that right.

 This is a close case and the unique facts that justified the warrantless search of defendant's home should not be over read. The sanctity of one's home is among our most cherished rights. *State v. Bruzzese,* 94 *N.J.* 210, 217, 463 *A.*2d 320 (1983), *cert. denied,* 465 *U.S.* 1030, 104 *S.Ct.* 1295, 79 *L.Ed.*2d 695 (1984). The very core of the Fourth Amendment and Article 1, Paragraph 7 protects the right of the people to be safe within the walls of their homes, free from governmental intrusion. *Kyllo v. United*

*States,* 533 *U.S.* 27, 31, 121 *S.Ct.* 2038, 2042, 150 *L.Ed.*2d 94, 100 (2001). The privacy interests of the home are entitled to the highest degree of respect and protection within our constitutional framework. *State v. Evers,* 175 *N.J.* 355, 384, 815 *A.*2d 432 (2003); *see also Bolte, supra,* 115 *N.J.* at 583–85, 560 *A.*2d 644; *Bruzzese, supra,* 94 *N.J.* at 217, 463 *A.*2d 320. But there are limited exceptions to the warrant requirement when the duty to preserve and protect life and the need to act decisively and promptly must outweigh the privacy interests of an individual. This case presents one such example.

## IV.

We conclude that the totality of the circumstances justified the warrantless entry into defendant's home under the emergency aid doctrine. For those reasons, we affirm the judgment of the Appellate Division reversing the grant of the motion to suppress evidence.

Justice WALLACE dissenting.

For the first time our Court condones a warrantless search of a home under the emergency aid doctrine based on an open line 9–1–1 call. I cannot agree, and therefore I respectfully dissent.

Both the Fourth Amendment of the United States Constitution and Article I, paragraph 7 of the New Jersey Constitution protect citizens against unreasonable searches and seizures by requiring warrants to be issued on probable cause. Any warrantless search is considered invalid until the State shows that the warrantless search "falls within one of the few well-delineated exceptions to the warrant requirement." *State v. Dangerfield,* 171 *N.J.* 446, 455, 795 *A.*2d 250 (2002) (citations and quotation marks omitted).

"An individual's privacy interests are nowhere more clearly defined or rigorously protected by the courts than in the home[,] the core of [F]ourth [A]mendment rights." *State v. Johnson,* 168 *N.J.* 608, 625, 775 *A.*2d 1273 (2001) (citation and quotation marks omitted) (alteration in original). Therefore, "[a] warrantless

search of a person's home 'must be subjected to particularly careful scrutiny.'" *State v. Cassidy,* 179 *N.J.* 150, 160, 843 *A.*2d 1132 (2004) (quoting *State v. Bolte,* 115 *N.J.* 579, 583, 560 *A.*2d 644, *cert. denied,* 493 *U.S.* 936, 110 *S.Ct.* 330, 107 *L.Ed.*2d 320 (1989)). This Court set out the heavy burden that the State bears when justifying a warrantless entry and search of a home by stating:

> [P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed. Accordingly, it is well established that searches and seizures inside a home without a warrant are presumptively unreasonable, and hence prohibited by the Fourth Amendment, absent probable cause and exigent circumstances.
>
> [*State v. Hutchins,* 116 *N.J.* 457, 463, 561 *A.*2d 1142 (1989) (citations and quotation marks omitted).]

Recently, the United States Supreme Court also emphasized that principle. "At the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable government intrusion. With few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no." *Kyllo v. United States,* 533 *U.S.* 27, 31, 121 *S.Ct.* 2038, 2041–42, 150 *L.Ed.*2d 94 (2001) (citation and quotation marks omitted).

"[T]he 'emergency aid' doctrine is an exception to the warrant requirement." *State v. Scott,* 231 *N.J.Super.* 258, 274, 555 *A.*2d 667 (App.Div.1989) (Ashbey, J.A.D., concurring and dissenting), *rev'd on dissent,* 118 *N.J.* 406, 571 *A.*2d 1304 (1990). To satisfy that exception, the State must show three elements: " '(1) the existence of an emergency as viewed objectively[;] (2) a search not motivated by a desire to find evidence[;] and (3) a nexus between the search and the emergency.'" *Cassidy, supra,* 179 *N.J.* at 161, 843 *A.*2d 1132 (quoting *Scott, supra,* 231 *N.J.Super.* at 275, 555 *A.*2d 667). In determining whether the first prong of that three-part test is met, we have explained that an emergency situation exists only when police officers, firefighters or other public officials "are confronted with evidence which would lead a prudent and reasonable official to see a need to act on that information, even if ultimately found erroneous." *Id.* at 161, 843 *A.*2d 1132. Stated another way, "the question is would the officers 'have been

derelict in their duty had they acted otherwise.' " *Id.* at 163, 843 *A.*2d 1132 (citation omitted).

In *Cassidy,* we recently addressed application of the emergency aid exception when the State seized weapons following a domestic violence dispute under *N.J.S.A.* 2C:25–21d. *Id.* at 162–63, 843 *A.*2d 1132. There, we explained that although *N.J.S.A.* 2C:25–21d allowed for the removal of weapons from the premises of a domestic violence situation if an officer believes the victim is in danger, there was no emergency that justified the invasion of the defendant's home because: (1) his home was not the scene of domestic violence that night; (2) there was no active altercation underway when police arrived; (3) the domestic violence incident complained of had occurred a month prior to the search; and (4) the parties had not been in contact for several days prior to the search. *Id.* at 163–64, 843 *A.*2d 1132. Thus, we refused to expand the emergency aid exception and adhered to this State's tradition of applying that exception only when there is a reasonable basis to believe an emergency existed. *Id.* at 163, 843 *A.*2d 1132; *see also State v. Garbin,* 325 *N.J.Super.* 521, 526–27, 739 *A.*2d 1016 (App. Div.1999) (holding warrantless entry into garage permissible because of smoke emanating from structure), *certif. denied,* 164 *N.J.* 560, 753 *A.*2d 1153 (2000); *State v. Garland,* 270 *N.J.Super.* 31, 45–46, 636 *A.*2d 541 (App.Div.) (allowing search of hotel room when police were told that children were left alone and search was focused on ascertaining their whereabouts and welfare), *certif. denied,* 136 *N.J.* 296, 642 *A.*2d 1005 (1994).

After analyzing the totality of circumstances here, I find insufficient evidence to demonstrate that there were reasonable grounds to believe an emergency existed in defendant's home. The police did act reasonably when they responded to the open line 9–1–1 call that originated from defendant's home because they did not know whether the call was an emergency or not. However, once defendant denied making the 9–1–1 call and offered a reasonable explanation for the call, the police no longer had a reasonable basis to believe someone was in need of assistance. Although

Gelber claimed that his suspicion was heightened by defendant's nervousness and his refusal to consent to a home search, neither of these grounds has ever been considered sufficient to overcome the heavy burden of justifying a warrantless search of a person's home in this State. *See State v. Lund,* 119 *N.J.* 35, 47–48, 573 *A.*2d 1376 (1990) (holding nervousness alone was insufficient to create probable cause to search without warrant); *District of Columbia v. Little,* 339 *U.S.* 1, 7, 70 *S.Ct.* 468, 471, 94 *L.Ed.* 599 (1950) (holding refusal to consent can never be used as evidence of a crime).

Further, the second test telephone call to the open line that resulted in a busy signal provided no additional justification under the totality of the circumstances analysis. First and most significant, defendant cooperated, quickly retrieved two portable phones, and demonstrated that the line rang. Second, there are countless reasons a telephone line might ring busy, including that it was a dedicated computer line. Third, there had been no prior distress calls from defendant's address. Fourth, as noted in footnote three of the majority opinion, the dispatcher had received three other open line 9–1–1 calls of unknown origin in that shift alone. Like *Cassidy,* there was no contemporaneous request for assistance or any other reasonable indication that someone inside the home was in need of assistance once defendant cooperated. Under those circumstances, Gelber would not have been "derelict in his duty" if he did not search defendant's home at that point, because his investigation produced no corroborating evidence to support a reasonable belief that someone inside was in need of assistance. Thus, any belief in a potential emergency was reduced to a mere hunch and any further search required a warrant.

Although I agree with the majority opinion that this is a close case, I disagree that the State met its heavy burden to justify the warrantless search of defendant's home. Because I conclude the evidence here was insufficient to justify such a search, I would reverse the judgment of the Appellate Division and reinstate the

judgment of the Law Division granting defendant's motion to suppress.

*For affirmance*—Chief Justice PORITZ and Justices LONG, LaVECCHIA, ZAZZALI and ALBIN—5.

*For reversal*—Justice WALLACE—1.