**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1141-19

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

WILLIAM B. WOODS,

     Defendant-Appellant.

_____

Submitted May 10, 2021 – Decided May 26, 2021

Before Judges Fasciale and Mayer.

On appeal from the Superior Court of New Jersey, Law Division, Burlington County, Indictment No. 18-05-0604.

Joseph E. Krakora, Public Defender, attorney for appellant (Michael Denny, Assistant Deputy Public Defender, of counsel and on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Steven A. Yomtov, Deputy Attorney General, of counsel and on the brief).

PER CURIAM

Defendant William B. Woods appeals from an October 25, 2019 judgment of conviction after pleading guilty to unlawful possession of a weapon, focusing his argument on the November 1, 2018 order denying his motion to suppress evidence. We affirm.

The facts are based on the testimony adduced during the October 30, 2018 suppression hearing. The judge considered the testimony of Patrolmen Joshua J. Treusch and Michael Hampton of the Mount Laurel Police Department. In addition, the judge viewed the DVD footage from the officers' body-worn cameras (BWCs).

On February 17, 2018, Patrolman Treusch was dispatched to the Red Roof Inn after several hotel guests reported a domestic violence incident in Room 233. One of the guests told a hotel employee about a fight between a man and a woman, reporting the man "was like walking in the room and wouldn't let her out and hurting her like." Another guest reported "that a female was being held against her will and that the male had threatened her life." The hotel manager told the patrolman that "the lady in 233 call[ed her and said] that's me and my baby's daddy out there but we're not really fighting."

Treusch called for backup and waited outside the hotel for other officers to arrive. Due to the report of a domestic violence incident, Treusch was

required to investigate to ensure "the safety and well-being of all individuals inside of the room."

Patrolmen Hampton and Levy arrived about five minutes later. The officers proceeded to Room 233, and Treusch knocked on the door several times, announcing "Mount Laurel Police." When no one answered the door, the officers obtained a master key from the hotel staff in order to enter the room and confirm the female occupant was "okay."

After opening the door and entering the room, the officers saw a dog lying on the bed next to a silver, snub-nose .38 revolver with a wooden handle. The officers removed the gun and checked the room, searching for occupants who might be injured or endangered. Except for the dog, the room was empty. While checking the room, the officers detected a strong odor of marijuana and saw a safe on the floor with the door ajar.[1]

Shortly after the police entered Room 233, the female occupant arrived. Treusch asked her about the male occupant. The woman said that was her boyfriend, and he left the hotel to return home. The female occupant gave the officers a false name and date of birth for her boyfriend.

---

[1] Inside the safe, the officers found marijuana and money.

A-1141-19

Treusch asked the female occupant if she was okay. She replied, "I'm perfectly fine." She further told the officer the couple was fighting but "we was just playing so."

While the female occupant was speaking to the officers, defendant returned to Room 233 and yelled out, "Babe, babe, come on, tell them we were playing." Defendant gave Patrolman Treusch a false first name and incorrect date of birth. The officers detained defendant and explained why he was being detained. Defendant then yelled, "Yo officer, everything's mine, everything. Whatever's there is mine. Whatever's in there – she don't got nothing to do with nothing, officer . . . She don't got nothing to do with it. It's mine, it's mine."

The officers frisked defendant. Defendant asked if their BWCs were activated, and the officers confirmed the cameras were recording. Defendant then gave the officers his true name and date of birth. After checking the serial number on the gun found in Room 233, the officers learned the gun had been stolen.

After his arrest, defendant was charged with second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1); second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b)(1); second-degree possession of a weapon during the course of committing a drug offense, N.J.S.A.

2C:39-4.1(a); third-degree receiving stolen property, N.J.S.A. 2C:20-7(a); third-degree hindering apprehension, N.J.S.A. 2C:29-3(b)(4); third-degree distribution of a controlled dangerous substance, N.J.S.A. 2C:35-5(a)(1) and N.J.S.A. 2C:35-5(b)(11); fourth-degree possession of marijuana, N.J.S.A. 2C:35-10(a)(3); and second-degree certain persons not to possess a weapon, N.J.S.A. 2C:39-7(b)(1). Defendant pleaded not guilty to the charges.

Prior to trial, defendant moved to suppress the physical evidence seized from Room 233 the night of the incident. The judge conducted an evidentiary hearing and heard the arguments of counsel on October 30, 2018. At the conclusion of the testimony, and after reviewing the footage from the officers' BWCs, the judge denied the suppression motion. The judge found the testimony of Patrolmen Treusch and Hampton credible and they testified "consistently." He noted "the testimony [wa]s also supported by the body cam footage that was marked as S-2 and S-3 in evidence and displayed during the course of [the] proceeding." The judge explained he found the officers' "testimony to be credible and that it's corroborated by the body worn cameras."

The judge concluded:

> I find in this particular case that the police, that the
> State have met their burden of showing that [there] was
> a basis for the emergency aid and/or community
> caretaking doctrine. The court finds that the actions of

Patrolman Treusch and Patrolman Hampton were entirely reasonable in light of all of the facts and circumstances presented to them. They c[a]me to a call of domestic violence. They are told that there are several complaints from guests on the second floor that a female (1) is being held against her wishes and (2) that there was a threat to kill the female.

Based on that information alone it would be reasonable for the officers to go to the room to investigate. . . .

Now there is a call from the [female occupant of Room 233] saying we were just playing. The officers as well as the hotel manager are not required to accept a call from the victim, alleged victim of domestic violence, that there is no domestic violence. It is entirely common, reasonable and understood generally that victims of domestic violence at times will deny that they've been abused. . . .

In any event, the officers had no way of verifying that and so their investigation into the room was entirely justified.

. . . .

The critical issue for the court is whether or not – and the parties acknowledge the issue – is whether or not the entry into the room was permissible. The court finds it was entirely permissible for the reasons stated.

After the judge's denial of the motion to suppress the physical evidence seized from Room 233, defendant entered into a negotiated agreement with the State wherein he pleaded guilty to second-degree unlawful possession of a weapon. At the plea hearing on July 15, 2019, the judge accepted the plea as

6

negotiated, including defendant's reservation of the right to appeal the denial of his motion to suppress the weapon. On October 25, 2019, the judge sentenced defendant in accordance with the terms of the plea agreement to a term of five years in prison with a forty-two-month period of parole ineligibility under the Graves Act. The remaining charges were dismissed.

On appeal, defendant raises the following argument:

> THE SEARCH OF THE HOTEL ROOM WAS AN UNCONSTITUTIONAL WARRANTLESS SEARCH, AND THE TRIAL COURT'S CONCLUSION THAT THE POLICE ENTRY WAS WARRANTED UNDER THE EMERGENCY AID OR COMMUNITY CARETAKING DOCTRINE WAS ERROR.

In our review of the grant or denial of a motion to suppress, we "must defer" to the motion judge's factual findings "so long as those findings are supported by sufficient evidence in the record." State v. Dunbar, 229 N.J. 521, 538 (2017) (quoting State v. Hubbard, 222 N.J. 249, 262 (2015)). We ordinarily defer to those findings because they "are substantially influenced by [the judge's] opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." State v. Lamb, 218 N.J. 300, 313 (2014) (quoting State v. Elders, 192 N.J. 224, 244 (2007)). We will disregard those findings only when a trial judge's findings of fact are "so clearly mistaken that the interests of justice demand intervention and correction." State v.

7

Hagans, 233 N.J. 30, 37-38 (2018) (quoting State v. Gamble, 218 N.J. 412, 425 (2014)).  We review a motion judge's legal conclusions de novo.  Dunbar, 229 N.J. at 538.

"Both the United States Constitution and the New Jersey Constitution guarantee an individual's right to be secure against unreasonable searches or seizures."  State v. Minitee, 210 N.J. 307, 318 (2012).  The State has the burden of proving by a preponderance of the evidence that warrantless searches and seizures are "justified by one of the 'well-delineated exceptions' to the warrant requirement."  State v. Shaw, 213 N.J. 398, 409 (2012) (quoting State v. Frankel, 179 N.J. 586, 598 (2004)).

The State argued the emergency aid and community caretaker exceptions to the search warrant requirement applied in this case based on reports of a domestic violence incident involving a female occupant in Room 233.  When exigent circumstances are present, "[p]olice officers serving in a community-caretaking role are empowered to make a warrantless entry into a home under the emergency-aid exception to the warrant requirement."  State v. Vargas, 213 N.J. 301, 323 (2013).  The emergency aid doctrine "is derived from the commonsense understanding that exigent circumstances may require public safety officials, such as the police, . . . to enter a dwelling without a warrant for

the purpose of protecting or preserving life, or preventing serious injury." State v. Hathaway, 222 N.J. 453, 469 (2015) (emphasis omitted) (quoting Frankel, 179 N.J. at 598). Under the emergency-aid exception, the State must show "(1) the officer had an objectively reasonable basis to believe that an emergency require[d] that he [or she] provide immediate assistance to protect or preserve life, or to prevent serious injury and (2) there was a reasonable nexus between the emergency and the area or places to be searched.'" Id. at 470 (first alteration in original) (quoting State v. Edmonds, 211 N.J. 117, 132 (2012)).

"The emergency-aid doctrine . . . must be 'limited to the reasons and objectives that prompted' the need for immediate action." Edmonds, 211 N.J. at 134 (quoting Frankel, 179 N.J. at 599). "If, however, contraband is 'observed in plain view by a public safety official who is lawfully on the premises and is not exceeding the scope of the search,' that evidence will be admissible." Hathaway, 222 N.J. at 470 (quoting Frankel, 179 N.J. at 599-600).

Here, the officers were dispatched to the hotel based on reports from other hotel guests of a domestic violence incident in Room 233. Based on those reports and the failure of anyone to answer the door when the police knocked and announced their presence, the officers were unable to ascertain whether there was someone inside Room 233 who required immediate emergency

assistance.  Police officers need not "stand by in the face of imminent danger and delay potential life-saving measures while critical and precious time is expended obtaining a warrant."  Frankel, 179 N.J. at 599.

The community caretaking function also justified the officers' entry into Room 233.  See State v. Bogan, 200 N.J. 61, 73 (2009) (holding "police officers perform a wide range of social services, such as aiding those in danger of harm, preserving property, and 'creat[ing] and maintain[ing] a feeling of security in the community.)'"  In Vargas, our Supreme Court held "[p]olice officers serving in a community-caretaking role are empowered to make a warrantless entry into a home under the emergency-aid exception to the warrant requirement."  213 N.J. at 323.

While there are similarities between the emergency aid and community caretaking exceptions, the two exceptions are doctrinally separate and distinct. State v. Witczak, 421 N.J. Super. 180, 192 (App. Div. 2011).  "The community-caretaker exception asks whether the police are 'engaged in "functions, [which are] totally divorced from detection, investigation, or acquisition of evidence relating to the violation of a statute."'"  Id. at 192 (quoting State v. Navarro, 310 N.J. Super. 104, 109 (App. Div. 1998)).  The emergency aid exception focuses on an objectively reasonable belief an emergency exists and there is a reasonable

nexus between the emergency and the area to be searched.  <u>Hathaway</u>, 222 N.J. at 470.

Here, the officers were engaged in their function as community caretakers, investigating whether someone occupying Room 233 was in immediate danger, requiring emergency aid.  In addition, under the emergency aid exception, the officers' conduct was objectively reasonable based on multiple reports from other hotel guests that a woman was being threatened and held against her will in the hotel room.  Once the officers entered the room searching for someone who may have required immediate assistance, the officers conducted a limited search of the room.  Based on their limited search, the officers found an open safe on the hotel room's floor, containing marijuana and cash, and a gun lying on the bed.  Having reviewed the record, we are satisfied the judge did not abuse his discretion in determining the community caretaking doctrine and emergency aid exception applied under these circumstances, justifying the warrantless search of the hotel room.  Thus, the judge properly denied defendant's motion to suppress.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

11