Reversed and remanded. We do not retain jurisdiction.

915 A.2d 569

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. DAVID AMODIO, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued October 12, 2006—Decided February 5, 2007.

Before Judges WEFING, C.S. FISHER and YANNOTTI.

*David A. Gies,* Designated Counsel, argued the cause for appellant (*Yvonne Smith Segars,* Public Defender, attorney; *Mr. Gies,* on the brief).

*Adrienne B. Reim,* Deputy Attorney General, argued the cause for respondent (*Stuart Rabner,* Attorney General, attorney; *Ms. Reim,* on the brief).

The opinion of the court was delivered by

YANNOTTI, J.A.D.

Tried to a jury, defendant was convicted of passion/provocation manslaughter, felony murder and other offenses. Defendant appeals his convictions and the sentences imposed. For the reasons that follow, we affirm in part, reverse in part and remand for resentencing on the conviction for passion/provocation manslaughter.

## I.

Defendant was charged in a Camden County indictment with the murder of Kollin Pimental (Kollin), *N.J.S.A.* 2C:11–3a(1) or (2) (count one); the murder of Lisa Pimental (Lisa), *N.J.S.A.* 2C:11–3a(1) or (2) (count two); felony murder of Kollin, *N.J.S.A.* 2C:11–3a(3) (count three); felony murder of Lisa, *N.J.S.A.* 2C:11–3a(3) (count four); aggravated arson, *N.J.S.A.* 2C:17–1a(1) (count five); hindering his own apprehension or prosecution, *N.J.S.A.* 2C:29–3b(1) (count six); and contempt of a domestic violence restraining order, *N.J.S.A.* 2C:29–9b (count seven).[1]

We briefly summarize the evidence presented at trial. In the latter part of September 2000, defendant purchased a home in Sicklerville, New Jersey. Defendant moved into the home with Lisa and Kollin, her son by a previous relationship. In mid-October 2000, following a domestic dispute, Lisa obtained a temporary restraining order which barred defendant from the Sicklerville residence. Notwithstanding the terms of the order, defen-

---

[1] The State thereafter filed and served upon defendant notice of certain aggravating factors that would justify the imposition of the death penalty. The grand jury returned a supplement to its indictment alleging these aggravating factors.

dant was at the house at times during the day and into the evening hours on October 28, 2000.

Sometime after midnight on October 29, 2000, one of defendant's neighbors heard a loud explosion. The neighbor looked out her window and saw flames coming out of the door on the side of defendant's house. The neighbor called 9–1–1, reported the fire, and ran to the house with her husband. The neighbor observed defendant "stumbling along" the driveway, away from the house. Defendant dropped "face-down onto the ground" and said his "wife" and the baby were upstairs in the rear bedroom.

The neighbor's husband attempted to enter the house but was prevented from doing so by the smoke and flames. An officer of the Gloucester Township Police Department (GTPD) arrived and observed defendant on the ground. The officer testified that defendant was "smoldering" and he recognized the smell of burning flesh. The policeman obtained a ladder from a neighbor and attempted to enter the second-floor bedroom but could not do so because of the smoke and heat.

Firefighters and emergency medical personnel arrived. They cut the clothing from defendant to stop the burning of his skin. Defendant's entire face was blackened and he had burns down to the muscles. Defendant was placed on a stretcher, removed by ambulance, taken to a helicopter and flown to a hospital in Pennsylvania. Later, the fire marshals found the burned bodies of Lisa and Kollin in the kitchen on the first floor of the house. Parts of a broken hammer were found near Lisa's body.

Dr. Robert Segal (Segal), the Camden County Medical Examiner at the time, performed autopsies of the victims. Segal testified that Lisa died, not of asphyxiation due to fire, but rather from a depressed skull fracture that caused bleeding and bruising to the brain. Segal testified that, although Lisa suffered from asthma, there was no evidence that she had an acute asthmatic attack at or about the time of her death. Segal also stated that Kollin died as a result of smoke inhalation and thermal burns, with no other contributing cause.

Dr. John E. Adams (Adams), defendant's expert in forensic pathology, testified that Lisa's skull fracture was not "a typical hammer fracture." Adams said that it was a "linear fracture" rather than a "punched-out" fracture. However, on cross-examination, Adams conceded that the fracture could have been caused by the blow of a hammer.

Adams said that there was an "appearance" of an acute asthmatic attack, based on mucus production found in the glandular lining of Lisa's bronchi. Adams stated that the attack was not due to an allergic reaction but possibly due to an emotional or stressful event. Adams opined that Lisa's death was caused by the head injury and asthma. He further opined that Kollin died from the inhalation of hot gasses and carbon monoxide.

Camden County Deputy Chief Fire Examiner Gene Dannenfelser (Dannenfelser) testified that he and Deputy Fire Marshall John West (West) performed an investigation into the origin and cause of the fire. Dannenfelser and West used a dog trained to detect the presence of accelerants. The dog gave the investigators "positive indications" in the center hallway of the house. Dannenfelser testified that it appeared that the fire began on the first floor and traveled to the second floor. Dannenfelser said that he believed an accelerant had been used, along with an open flame, to ignite the accelerant. Ronald F. Decker (Decker), defendant's expert in fire investigations, agreed with the fire inspectors' determination regarding the origin and progression of the fire. He stated that about a quart of gasoline had been used but the cause of the fire was "undetermined."

The clothes removed from defendant when he received emergency assistance were tested by forensic scientists at the State Police laboratory. The tests revealed a residue of gasoline on defendant's socks, jeans, and sneakers. The tests also revealed that Kollin's blood was on defendant's sock and pants, and Lisa's blood was on defendant's pants and left sneaker.

Defendant testified on his own behalf. He stated that he began dating Lisa in May 2000 and in the period from May to July 2000,

he would stay with Lisa at her house one night each weekend. In the summer of 2000, defendant and Lisa fought and broke off their relationship. However, they resumed dating in July 2000. They talked about moving in together and getting married. In late August 2000, defendant agreed to purchase the house in Sicklerville.

The closing took place on September 29, 2000, and defendant moved in that day. Lisa and Kollin moved in the following day. Defendant said that he and Lisa lived together without any problems until October 11, 2000, when they had a dispute because Lisa had not washed his clothes. Defendant took his clothes to his father's house to wash them there. He returned after 11:00 p.m. and told Lisa that he thought they should put off the wedding. According to defendant, Lisa gave him the "cold shoulder" and left the room.

Defendant went upstairs and began his usual exercise routine. Defendant said that he was laying on the floor, doing sit-ups and push-ups. Defendant recounted that when he pushed up, he lifted the mattress, and Lisa fell to the floor. Lisa got up and "slugged" him in the face with a closed fist. Some time later, Lisa told defendant that she was going to pack some things and leave.

In the morning, defendant went to the local police to inform them "about what [had] happened" with Lisa. Defendant was told that Lisa had obtained a domestic violence restraining order and that he could not have any contact with her. Defendant was escorted to his home by two uniformed officers so that he could gather his clothing and some of his personal belongings. Afterwards, defendant returned to the police station and filed a complaint against Lisa for striking him in the face with her fist.

Defendant testified that he had no contact with Lisa until she called him on October 19th. They met at a diner and talked about working out their problems. According to defendant, Lisa was glad to see him. However, they did not discuss his moving back into the house in Sicklerville. Lisa called the next day because she wanted to "work things out." On October 21, 2000, Lisa called

again and said that she wanted to go shopping for a clothes washing machine and dryer. Defendant accompanied her to the store, purchased the washer and dryer, loaded the machines on a truck, and drove home. Defendant installed the machines in the house. Defendant did not stay the night.

Defendant also said that in the week before the fire, he performed work around the house, including cutting the grass and making sure that "everything looked clean and nice and neat." Defendant and Lisa returned to court on October 24th. The restraining order was extended to November 27, 2000, and defendant agreed to take anger management counseling.

On the morning of October 28, 2000, defendant provided funds to Lisa for her car payment. He also purchased new tires for Lisa's car and helped Lisa and Kollin decorate the house for Halloween. Later, the couple ordered Chinese food and they watched television. After Kollin fell asleep, Lisa brought him upstairs to his bed. She returned, wearing only a T-shirt. Defendant and Lisa were "almost" intimate but defendant said that he was tired and "couldn't do it." Lisa gave defendant the "cold shoulder" and stopped speaking to him.

Sometime after midnight, defendant decided to leave. Defendant went to the shed in the rear of the house to collect some tools so that he could make certain repairs at his father's house. Defendant was in the shed about fifteen minutes and then went to his vehicle. Defendant said that he was returning to the shed when he saw the fire. Defendant denied that he did anything to hurt Lisa or Kollin. He said that he did not kill Lisa or Kollin.

The jury found defendant not guilty of murder on count one, but guilty of the lesser-included offense of the aggravated manslaughter of Kollin; not guilty of murder on count two, but guilty of the passion/provocation manslaughter of Lisa; guilty of the felony murder of Kollin as charged in count three; not guilty of the felony murder of Lisa as charged in count four; not guilty of first-degree arson as charged in count five, but guilty of the lesser-included offense of third-degree arson; guilty of hindering his own

apprehension or prosecution, as charged in count six; and guilty of contempt as charged in count seven.

The judge later denied defendant's motion for a new trial and sentenced defendant, among other sentences, to life in prison on count three, with a thirty-year period of parole ineligibility; and a consecutive term of ten years on count two, with a period of parole ineligibility as prescribed by the No Early Release Act (NERA), *N.J.S.A.* 2C:43–7.2.

In this appeal, defendant raises the following contentions:

I. THE ITEMS SEIZED AFTER THE CHIEF FIRE MARSHALL FOUND TWO BODIES IN THE BURNED HOME SHOULD HAVE BEEN SUPPRESSED BECAUSE THE STATE DID NOT OBTAIN A SEARCH WARRANT AND NO EXIGENT CIRCUMSTANCES WERE PRESENT.

II. THE ADMISSION OF THE TEMPORARY RESTRAINING ORDER PRECLUDED THE DEFENDANT FROM RECEIVING A FAIR TRIAL WHERE THE TRIAL COURT'S LIMITED INSTRUCTION FOCUSED THE JURY'S ATTENTION ON THE DEFENDANT'S PROPENSITY TO COMMIT THE MURDER OF HIS GIRLFRIEND. (Not raised below).

III. THE DEFENDANT'S CONVICTIONS ARE AGAINST THE WEIGHT OF THE EVIDENCE AND SHOULD BE SET ASIDE BECAUSE THE JURY FAILED TO RECOGNIZE EVIDENCE POINTING TO REASONABLE DOUBT.

IV. A TRIAL COURT MUST, UNDER THE NEW RULE OF LAW, WEIGH THE AGGRAVATING AND MITIGATING FACTORS UNENCUMBERED BY THE PRESUMPTIVE STATUTORY TERM WHEN SENTENCING THE DEFENDANT. (Not raised below).

V. THE TRIAL COURT ERRED IN IMPOSING A CONSECUTIVE TERM WHERE IT DETERMINED THE CRIMES REMOTE AND INDEPENDENT FROM ONE ANOTHER.

VI. UNDER THE PRE–AMENDMENT STATUTE, NERA DOES NOT APPLY TO A HOMICIDE WHICH WOULD OTHERWISE BE MURDER BUT FOR ITS COMMISSION IN THE HEAT OF PASSION. (Not raised below).

## II.

We first consider defendant's contention that the judge erred by denying his motion to suppress evidence obtained by the police and other officials in their investigation of the fire. Defendant contends that, once the fire inspectors found the bodies, they should have suspended the investigation until a search warrant

was obtained. Defendant also argues that the investigators unlawfully seized items of his clothing, his cell phone and other items, and illegally searched the shed behind his house.

■    The Fourth Amendment to the Constitution of the United States, and Article I, Paragraph 7 of the New Jersey Constitution, protect citizens against unreasonable searches and seizures by requiring the issuance of a warrant based upon a showing of probable cause, unless the search comes "within one of the few well-delineated exceptions to the warrant requirement." *State v. Maryland,* 167 *N.J.* 471, 482, 771 *A.*2d 1220 (2001) (quoting *Schneckloth v. Bustamonte,* 412 *U.S.* 218, 219, 93 *S.Ct.* 2041, 2043, 36 *L.Ed.*2d 854, 858 (1973)).

■    In certain exigent circumstances, "a search without a warrant is both reasonable and necessary." *State v. Frankel,* 179 *N.J.* 586, 598, 847 *A.*2d 561 (2004). "A burning building clearly presents an exigency of sufficient proportions to render a warrantless entry 'reasonable.'" *Michigan v. Tyler,* 436 *U.S.* 499, 509, 98 *S.Ct.* 1942, 1950, 56 *L.Ed.*2d 486, 498 (1978). Once inside the building, the police and fire officials may seize evidence of arson that is in plain view. *Ibid.*

■    However, the exigency does not end at the moment the fire is extinguished:

> Fire officials are charged not only with extinguishing fires, but with finding their causes. Prompt determination of the fire's origin may be necessary to prevent its recurrence, as through the detection of continuing dangers such as faulty wiring or a defective furnace. Immediate investigation may also be necessary to preserve evidence from intentional or accidental destruction. And, of course, the sooner the officials complete their duties, the less will be their subsequent interference with the privacy and the recovery efforts of the victims. For these reasons, officials need no warrant to remain in a building for a reasonable time to investigate the cause of a blaze after it has been extinguished.
>
> [*Id.* at 510, 98 *S.Ct.* at 1950, 56 *L.Ed.*2d at 499.]

Nevertheless, when "reasonable expectations of privacy remain in the fire-damaged property, additional investigations begun after the fire has been extinguished and fire and police officials have left the scene, generally must be made pursuant to a warrant or the

identification of some new exigency." *Michigan v. Clifford,* 464 *U.S.* 287, 293, 104 *S.Ct.* 641, 647, 78 *L.Ed.*2d 477, 484 (1984).

Although reported decisions in New Jersey have recognized that in certain emergency situations, the Fourth Amendment to The United States Constitution and the corresponding provision of the New Jersey Constitution do not require law enforcement officers to obtain a search or arrest warrant, no reported opinion has addressed or applied the principles set forth in *Tyler* and *Clifford,* as they relate to an exigency created by a fire.

In our view, the trial judge correctly applied these principles when he denied defendant's motion to suppress the evidence found during the investigation of the fire. The evidence presented at the suppression hearing revealed that Dannenfelser arrived at the scene at around 2:00 a.m. when the fire was under control. Dannenfelser and West conducted their investigation of the fire by systematically going through every room in the house. They checked for all possible ignition sources, including electrical devices, appliances, evidence of smoking materials, chemicals, and ignitable liquids.

The second floor of the house had partially collapsed. After West had gone through the rooms which remained on that floor, Dannenfelser and West continued their investigation in the rear bedrooms on the first floor. The smoke stains and fire patterns indicated that the fire had originated in the front section of the house. Dannenfelser and West moved to the living room area, and checked the circuitry and electrical appliances. They observed no abnormal electrical activity. Dannenfelser and West then proceeded into the kitchen and sifted through the debris. There they found pieces of the roof rafters and shingles. Near the refrigerator, they found the bodies of Lisa and Kollin.

Dannenfelser and West hand-sifted the materials around the victims. Dannenfelser explained that they did so to see if there was evidence of any materials that might have caused the fire and to determine where the victims were prior to the fire. Around Lisa's body, they found the fiberglass handle of a hammer. They

also found the metal part of the hammer. Dannenfelser concluded that the victims had been on the first floor at the time of the fire.

The investigators looked at the appliances in the kitchen to determine whether they were a source of ignition. They observed that the most damaged area of the home was the front hallway. Dannenfelser stated that they found a metal-clad door lying in the center of the hallway. When West lifted the door, Dannenfelser smelled an odor characteristic of gasoline.

Dannenfelser and West continued to sift through the debris to determine whether gasoline had been stored in the house. They sifted debris down to the floor. They washed the floor and observed areas of spalling in the concrete underneath the door.[2] This was an indication that a flammable liquid had been employed in that area. West brought a dog trained to detect accelerants into the house. The dog gave the investigators "positive indications" of the presence of an accelerant in the front hallway. Dannenfelser and West collected debris from the center hallway and placed it in a metal evidence can, to maintain the integrity of whatever volatile substance might be in the debris.

Thereafter, Dannenfelser and West took the dog around the perimeter of the house. The dog showed interest in the front door on the passenger side of defendant's vehicle which was parked in the driveway. Dannenfelser and West left the scene around 6:00 a.m. On October 31, 2000, search warrants were obtained for the house, detached garage, defendant's vehicle, defendant's clothing, and the cell phone. The search warrants were executed on November 1, 2000.

The trial judge correctly found that under *Tyler* and *Clifford* the investigators were permitted to remain on the premises for a reasonable period of time to conduct their investigation into the cause and origin of the fire. Here, the investigators stayed a reasonable time before they departed and sought the issuance of

---

[2] Dannenfelser explained that spalling occurs when pieces of concrete break apart and leave patterns that are observable.

search warrants. The hammer and debris from the front hallway were found in plain view during the course of that initial investigation. Indeed, when searching a fire scene to discover the cause of a fire, firemen routinely remove rubble; and objects that come into plain view as a result of such actions may be preserved without a warrant. *Clifford, supra,* 464 *U.S.* at 295 n. 6, 104 *S.Ct.* at 647 n. 6, 78 *L.Ed.*2d at 485 n. 6.

■ The judge also correctly rejected defendant's assertion that the investigators were required to obtain a search warrant when they found the bodies in the kitchen because, at that point, the investigators had not completed their investigation into the cause and origin of the fire. Moreover, the investigators were not required to cease their investigation when they detected the odor of gasoline in the front hallway. As the judge pointed out, Dannenfelser and West continued their investigation in order to eliminate other possible sources of ignition.

■ We must defer to the judge's findings where, as in this case, they are based upon sufficient credible evidence. *State v. Locurto,* 157 *N.J.* 463, 471, 724 *A.*2d 234 (1999) (citing *State v. Johnson,* 42 *N.J.* 146, 161–62, 199 *A.*2d 809 (1964)). The judge found that Dannenfelser's testimony regarding his investigation was credible. Deference to the judge's findings is particularly appropriate when the findings are "substantially influenced" by the judge's opportunity to "hear and see the witnesses." *Ibid.* (quoting *Johnson, supra,* 42 *N.J.* at 161, 199 *A.*2d 809).

■ Defendant additionally argues that the clothing cut from his body was illegally seized. We disagree. Defendant's clothing was removed in order to provide emergency medical treatment. In such exigent circumstances, the warrantless seizure of the garments was permissible. The clothing could have been discarded. Moreover, because of the possible presence of an accelerant, the value of the clothing as evidence could have been substantially diminished if it was not secured promptly.

These circumstances are similar to those presented in *State v. Adams*, 224 *N.J.Super.* 669, 541 *A.*2d 262 (App.Div.1988), where we held that law enforcement officers validly examined and seized the defendant's clothing without a warrant when he was in the emergency room for treatment after having been shot. *Id.* at 671, 541 *A.*2d 262. The officers examined the clothing as part of their investigation of the shooting and discovered a package containing heroin. *Id.* at 674, 541 *A.*2d 262. We held that in the circumstances, warrantless seizure of the clothing was necessary to avoid destruction of any "trace evidence" on the garments that might be related to the shooting. *Ibid.*

Defendant also takes issue with the seizure of his jacket and cell phone. The jacket was found on the lawn by a police officer when he responded to the scene at around 12:50 a.m. It is unclear where defendant's cell phone was found, but West turned it over to the police around 5:00 a.m. Defendant argues that the judge erred in concluding that defendant had abandoned these items. We are convinced, however, that an opinion on this issue is not required.

The record makes clear that the jacket and cell phone had virtually no evidential value in this case. No residue of gasoline was found on the jacket and, while traces of blood were found on the jacket and cell phone, DNA tests performed by the State Police revealed that these traces consisted only of defendant's blood. Thus, even if we were to conclude that defendant had not abandoned the jacket and cell phone, and there is no alternative legal basis for the seizure of these items, we would conclude that their admission into evidence was not reversible error.

Defendant additionally contends that after the fire, the investigators wrongfully searched the shed behind his house without a warrant. Again, we disagree. Aida Marcial, a homicide detective with the Camden County Prosecutor's Office, testified at the suppression hearing that she and the fire investigators walked into the backyard and used a flashlight to look into the opening in the shed. They saw a lawn mower but did not see a container for gasoline. The investigators did not enter the shed at that time

and did not do so until a search warrant had been obtained. Thus, the investigators did not undertake an unlawful warrantless search of the shed. They were lawfully on the premises and merely observed what was in plain view. *Frankel, supra,* 179 *N.J.* at 599–600, 847 *A.*2d 561.

## III.

We next consider defendant's contention that the trial judge erred in instructing the jury with regard to the temporary domestic violence restraining order.

The record shows that the judge discussed the instructions with counsel at a charge conference. Defense counsel agreed to the proposed charge, but insisted that the restraining order be referred to as a temporary order. The trial judge instructed the jury as follows:

> Now, ladies and gentlemen of the jury, during the course of this trial, you have heard testimony regarding a temporary restraining order obtained by Lisa Pimental against the defendant, David Amodio. Now, the existence of this temporary restraining order may not be used by you as a jury to infer that the defendant committed any acts of violence. The temporary restraining order is not proof of violent acts. It may, however, be considered to assess or determine the defendant's credibility as to the existence of motive to commit the crimes and may be considered as a basis for the contempt charge in Count Seven of the indictment in this case.

Defendant now argues that the judge erred by failing to focus the jury's attention on the specific purpose for which the temporary restraining order may be used. We consider this contention under the plain error standard. *R.* 2:10–2.

When a defendant is charged with contempt of a domestic-violence restraining order, and other offenses arising from the same incident, the charges should be tried sequentially. *State v. Chenique–Puey,* 145 *N.J.* 334, 343, 678 *A.*2d 694 (1996). The underlying offense should be tried first and, in that proceeding, the restraining order is not admissible unless the defendant testifies, in which case, the order is admissible to impeach defendant's testimony. *Ibid.* "Following a verdict on the underlying

offense, the trial court should immediately proceed to try the contempt charge before the same jury." *Ibid.*

Here, the trial judge initially severed the contempt charge from the other offenses charged in the indictment. Defense counsel recognized that if defendant testified, the restraining order could be used for impeachment purposes. Defendant testified and he was questioned about the order. Later, the parties agreed to have the jury consider the contempt charge with the other charges.

In our view, the judge's instruction to the jury on the restraining order did not improperly focus the jury on defendant's propensity or predisposition to commit the underlying offense. Indeed, as we have pointed out, the judge specifically informed the jurors that the restraining order was not proof of any violent acts. Moreover, the judge stated that the order could not be used by the jurors to infer that defendant committed any acts of violence. The judge instructed the jury that the order could be considered to assess defendant's credibility as to the existence of any motive to commit the crimes.

The instruction was entirely consistent with *N.J.R.E.* 404(b), which provides that:

> Evidence of other crimes, wrongs or acts is not admissible to prove the disposition of a person in order to show that such person acted in conformity therewith. Such evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute.

Defendant's motive was a material issue in dispute. He testified that he did not kill Lisa and did not start the fire that took Kollin's life. Clearly, the credibility of these statements was at issue. Furthermore, the temporary restraining order provided evidence that defendant may have been motivated to commit the crimes because Lisa had obtained the order, which barred him from having any contact with her and forced him to leave the house he had recently purchased.

We therefore are convinced that the charge regarding the restraining order properly instructed the jury on the manner in

which the order could be used by the jury in its deliberations and fact-finding. The charge was not erroneous, nor was it clearly capable of leading to an unjust result. *R.* 2:10–2.

## IV.

Defendant also raises several issues with regard to his sentences. Here, the judge found aggravating factors under *N.J.S.A.* 2C:44–1a(1) (nature and circumstances of the offenses); *N.J.S.A.* 2C:44–1a(2) (the gravity and seriousness of harm inflicted on the victim, including whether defendant knew or should have known that the victim was extremely young); *N.J.S.A.* 2C:44–1a(3) (risk that defendant will commit another crime); and *N.J.S.A.* 2C:44–1a(9) (need to deter defendant and others from violating the law). The judge found a mitigating factor under *N.J.S.A.* 2C:44–1b(7) (defendant has had no history of prior delinquency or prior criminal activity). The judge rejected defendant's contention that additional mitigating factors should be found.[3]

The judge merged counts one and five with count three (felony murder) and sentenced defendant to life imprisonment with a thirty-year period of parole ineligibility. On count two (passion/provocation manslaughter), the judge imposed a consecutive ten-year term, with a period of parole ineligibility as prescribed by NERA. The judge additionally imposed a concurrent four-year term on count six (hindering his own apprehension); and a concurrent term of nine months on count seven (contempt). The judge also imposed appropriate penalties and assessments.

---

[3] Defendant urged the judge to find mitigating factors under *N.J.S.A.* 2C:44–1b(2) (defendant did not contemplate his conduct would cause serious harm); *N.J.S.A.* 2C:44–1b(8) (defendant's conduct unlikely to reoccur); *N.J.S.A.* 2C:44–1b(9) (defendant is unlikely to commit another offense); *N.J.S.A.* 2C:44–1b(10) (defendant is likely to respond to probationary treatment); and *N.J.S.A.* 2C:44–1b(11) (imprisonment would entail excessive hardship). We are convinced that the judge correctly found that none of these factors applied.

A. *Sixth Amendment Claim*

■ Defendant argues that the sentences were imposed in contravention of his right to trial by jury under the Sixth Amendment to the United States Constitution, as interpreted in *Blakely v. Washington*, 542 *U.S.* 296, 124 *S.Ct.* 2531, 159 *L.Ed.*2d 403 (2004).

In *State v. Natale*, 184 *N.J.* 458, 466, 878 *A.*2d 724 (2005), the Court held that the imposition of a sentence longer than the presumptive statutory term based solely on judicial finding of aggravating factors other than a prior criminal conviction violates the defendant's right under the Sixth Amendment to trial by jury, as interpreted in *Blakely*. The Court eliminated the presumptive terms from the sentencing scheme in order "[t]o bring the Code into compliance with the Sixth Amendment in a way that the Legislature would have intended." *Natale, supra,* 184 *N.J.* at 466, 878 *A.*2d 724. The Court required new sentencing hearings, based on the prior sentencing record, in affected cases. However, the Court limited this relief to defendants whose cases were on direct appeal at the time of its decision, and defendants who raised *Blakely* claims at trial or on direct appeal. *Id.* at 494–96, 878 *A.*2d 724.

The State concedes that *Natale* requires that defendant be re-sentenced on count two. We agree. Because the ten-year sentence imposed on that count is longer than the presumptive term for passion/provocation manslaughter, and because the sentence was imposed based on findings other than the defendant's prior criminal record, re-sentencing is required.

However, re-sentencing is not required on count three (felony murder). *See State v. Abdullah*, 184 *N.J.* 497, 507–08, 878 *A.*2d 746 (2005) (noting that under *N.J.S.A.* 2C:11–3b(1) there is no presumptive term for murder). Re-sentencing also is not required on counts six (hindering apprehension) and count seven (contempt) because the sentences imposed on those counts do not exceed the applicable presumptive terms for the offenses. *N.J.S.A.* 2C:44–1f(1)(d) and (e).

### B. *Consecutive sentence*

■ Defendant next contends that the judge erred by imposing a consecutive sentence on count two. We disagree.

The judge properly found that there were two crimes involving separate victims and the evidence established that the deaths of the victims occurred at different times. Furthermore, Lisa's murder and the setting of the fire that killed Kollin were separate acts of violence.

In our view, the judge's findings reflect an appropriate consideration of the factors enumerated in *State v. Yarbough,* 100 *N.J.* 627, 630, 498 *A.*2d 1239 (1985), *cert. denied,* 475 *U.S.* 1014, 106 *S.Ct.* 1193, 89 *L.Ed.*2d 308 (1986).[4] We therefore conclude that the judge did not abuse his discretion when he imposed a consecutive sentence on count two.

### C. *Application of NERA to count two*

■ Defendant additionally argues that the judge erred by applying NERA to defendant's sentence for passion/provocation manslaughter. Again, we disagree.

■ A sentencing court applies "the NERA provisions in effect on the date of the crime." *State v. Johnson,* 376 *N.J.Super.* 163, 168, 869 *A.*2d 473 (App.Div.), *certif. denied,* 183 *N.J.* 592, 874 *A.*2d 1109 (2005). The offenses at issue here were committed on October 29, 2000, which was before the June 29, 2001, effective date of certain amendments to NERA. *L.* 2001, *c.* 129, § 1.

In *State v. Manzie,* 335 *N.J.Super.* 267, 278, 762 *A.*2d 276 (App.Div.2000), *aff'd,* 168 *N.J.* 113, 773 *A.*2d 659 (2001), we held

---

[4] *Yarbough* indicated that there should be an overall outer limit on the cumulation of consecutive sentences, not to exceed the aggregate of the longest terms that could be imposed for the two most serious offenses. *Yarbough, supra,* 100 *N.J.* at 643–44, 498 *A.*2d 1239. That factor was superseded by *L.* 1993, *c.* 223, which amended *N.J.S.A.* 2C:44–5a. The other *Yarbough* factors remain as guides for the exercise of sentencing discretion. *State v. Pennington,* 154 *N.J.* 344, 361–62, 712 *A.*2d 1133 (1998).

that the version of NERA in effect prior to the 2001 amendments did not apply to murder in part because murder has its own extensive sentencing scheme. However, manslaughter is not murder. *N.J.S.A.* 2C:11–4c. Thus, the application of NERA to count two in this case was proper. *See State v. Viera,* 346 *N.J.Super.* 198, 206–7, 787 *A.*2d 256 (App.Div.2001), *certif. denied,* 174 *N.J.* 38, 803 *A.*2d 634 (2002) (holding that NERA applied to passion/provocation manslaughter committed before the effective date of the NERA amendments).

We are additionally satisfied that the sentences imposed on counts three, six, and seven are not manifestly excessive or unduly punitive, were not an abuse of the judge's sentencing discretion, and do not shock the judicial conscience. *State v. O'Donnell,* 117 *N.J.* 210, 215–16, 564 *A.*2d 1202 (1989); *State v. Roth,* 95 *N.J.* 334, 363–65, 471 *A.*2d 370 (1984).

We have considered all of the other contentions raised by defendant in this appeal and we are convinced that these assertions are not of sufficient merit to warrant discussion in this opinion. *R.* 2:11–3(e)(2).

We therefore affirm defendant's convictions and the sentences imposed on counts three, six, and seven. We vacate the sentence imposed on count two and remand for re-sentencing pursuant to *Natale, supra,* 184 *N.J.* at 495–96, 878 *A.*2d 724. We conclude, however, that a consecutive sentence may validly be imposed on count two and the version of NERA in effect in October 2000 applies to passion/provocation manslaughter.

Affirmed in part, reversed in part and remanded for re-sentencing on count two. We do not retain jurisdiction.